IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROLLAND SEAN TOWLES, #279634, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:15-CV-146-MHT |
| | ) | |
| DR. BOB MENDLE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This cause of action is pending before the court on a 42 U.S.C. § 1983 complaint filed by Rolland Sean Towles ("Towles"), an indigent state inmate presently incarcerated at the Bullock Correctional Facility ("Bullock").  In the complaint, Towles alleges that the defendants have denied him adequate medical/dental treatment for a myriad of conditions including, but not limited to, right knee pain, removal of a diseased wisdom tooth, follow-up care for the tooth extraction, frontal lobe damage, a MRSA infection, a partially separated right shoulder, right wrist pain, gastrointestinal issues, an enlarged prostate, a scarred left lung, a metallic object in his liver, sinus issues and hip pain.  Towles also alleges that Dr. Siddiq has denied him medical treatment in retaliation for filing this case.

On June 25, 2015, Towles filed motions for preliminary injunction in which he seeks injunctive relief requiring that the defendants refer him to free world physicians for treatment of various medical conditions.  *Doc. No. 72* and *Doc. No. 73*.

On June 25, 2015, the court entered an order directing the defendants to show cause why Towles' motions for preliminary injunction should not be granted. *Doc. No. 79*. The defendants filed an initial response to this order in which they reference relevant evidentiary materials previously filed with their special reports and supplemental responses with supporting evidentiary materials. In these responses, the defendants argue that Towles is not entitled to issuance of a preliminary injunction as he has received appropriate treatment for his medical issues.

Upon review of the motions for preliminary injunction and the special reports and responses filed by the defendants, the court concludes that the plaintiff's motions for preliminary injunction are due to be denied.

## II.  STANDARD OF REVIEW

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). This court may grant a preliminary injunction only if Towles demonstrates each of the following prerequisites: (1) a substantial likelihood of success on the merits; (2) a substantial threat irreparable injury will occur absent issuance of the injunction; (3) the threatened injury outweighs the potential damage the requested injunction may cause the non-moving parties; and (4) the injunction would not be adverse to the public interest. *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352

(11th Cir. 1983). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion"' as to the four requisites." *McDonald's*, 147 F.3d at 1306; *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (a preliminary injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion). The moving party's failure to demonstrate a "substantial likelihood of success on the merits" may defeat the party's claim, regardless of the party's ability to establish any of the other elements. *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994); *see also Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (noting that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper"). "'The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.'" *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir.1990)).

## III. DISCUSSION

In their responses to the motions for preliminary injunction, the defendants deny that they have acted with deliberate indifference to Towles' medical needs. *Exh. 3 to the Defendants' Special Report - Doc. No. 20-3*; *Exh. 2 to the Defendants' Supplemental Special*

3

*Report - Doc. No. 58-2*; *Exh. 1 to the Defendants' Fourth Supplemental Special Report - Doc. No. 115-1*; *Exh. 1 to the Defendants' Fifth Supplemental Special Report - Doc. No. 125-1* Specifically, the defendants maintain that the medical staff provided treatment to Towles for each of his respective conditions in accordance with their professional judgment and further assert that referral to free-world physicians for treatment is neither necessary nor warranted at this time. In addressing Towles' claims regarding the treatment he has received, Dr. Tahir Siddiq, the Medical Director at Bullock, provides the following information:

Mr. Towles saw the nurse practitioner at Bullock on May 19, 2014, at which time he threatened to sue the medical staff at Bullock unless he received the medication Ultram. After making this threat, members of the ADOC security staff escorted Mr. Towles from the medical unit. Within days of this incident, Mr. Towles began voicing persistent complaints related to right knee pain. In a sick call request form dated June 3, 2014, Mr. Towles requested an evaluation of his right knee, which he complained was in pain. However, when Mr. Towles reported to sick call on June 4, 2014, he only voiced complaints of right shoulder pain and did not mention knee pain of any kind. Nevertheless, the sick call nurse still provided Mr. Towles additional ibuprofen and a topical muscle treatment for his shoulder.

Mr. Towles submitted a sick call request form dated June 11, 2014, asking to see me regarding pain in his right knee. Upon receiving Mr. Towles' June 11, 2014, sick call request form, he was scheduled to be seen by me. The nurse practitioner at Bullock conducted an examination of Mr. Towles [when he reported to sick call] on June 12, 2014. At the time of the examination, Mr. Towles did not mention anything related to right knee [pain], but only requested a renewal of his existing pain medications as well as the renewal of a no-standing profile, which he received.

Mr. Towles submitted another sick call request form on June 30, 2014 requesting an evaluation of his right knee as well as a handicap "profile." In the sick call request form, Mr. Towles also references running out of medications. The medical staff saw Mr. Towles during sick call on July 1, 2014. At the time of the sick call evaluation, Mr. Towles had run out of pain medication and was requesting a renewal of the pain medication and, as such,

4

the medical staff referred him to a practitioner for renewal, which he subsequently received.

In a sick call request form dated July 12, 2014, Mr. Towles continued to complain of pain in his right knee. The Bullock medical staff evaluated Mr. Towles during sick call on July 13, 2014. At the time of this July [13], 2014, examination, Mr. Towles reported that Ultram improved his overall pain in his right shoulder and right knee. Mr. Towles was referred to a clinician and told to notify the medial staff if his condition should change. Between June and August of 2014, I along with the other clinicians at Bullock saw Mr. Towles on a least five different occasions regarding his complaints of knee discomfort and/or his persistent requests for pain medication.

In August of 2014, Mr. Towles continued to submit repeated sick call request forms related to his complaints of right knee pain. Mr. Towles submitted a sick call request form on August 22, 2014, requesting a cane or "something" for his knee, which he complained was "giving out" and further stated that he believed that his knee required "replacing." Mr. Towles failed to appear for sick call on August 22, 2014. The Bullock medical staff evaluated Mr. Towles the following day for complaints of right knee pain, at which time he was referred to the nurse practitioner for further evaluation. Upon examining Mr. Towles, the nurse practitioner decided to order an x-ray of his right knee on August 28, 2014, though Mr. Towles did not exhibit any signs or symptoms of injury, trauma or other defect. Mr. Towles underwent an x-ray of his right knee on August 29, 2014 which did not reveal any underlying condition or otherwise provide any evidence of any condition resulting in pain or discomfort.

I saw Mr. Towles on September 5, 2014 and evaluated him for his complaints of knee pain. At the time of the evaluation, it was not obvious that he was experiencing any particular type of injury or signs or symptoms of injury, and that his condition was likely the result of some type of arthritic condition. Therefore, I continued the prior orders for a non-steroidal anti-inflammatory for Mr. Towles.

In a sick call request form dated January 26, 2015, Mr. Towles complained about his right knee getting worse. The Bullock medical staff evaluated Mr. Towles on January 27, 2015, at which time he complained of pain in his right knee. He was evaluated during sick call and was referred to a clinician for further evaluation. The nurse practitioner at Bullock saw Mr. Towles on January 27, 2015 and evaluated him for his complaints of knee pain and for his request for renewed pain medications, which he received during the course of the evaluation. As with all of the prior examinations, this

examination did not reveal any evidence that Mr. Towles was experiencing any actual medical problem with his knee resulting in pain or discomfort.

I next saw Mr. Towles on February 9, 2015, at which time he did not voice any complaints of any kind related to his right knee. Mr. Towles submitted a sick call request form dated February 22, 2015, in which he requested to be seen "for my pain medication" and that he be seen by an orthopedic specialist [for evaluation of his knee and shoulder]. A registered nurse evaluated Mr. Towles on February 23, 2015, during sick call with respect to his complaints of right knee pain, but concluded that, given Mr.Towles' current pain medication regimen and the recent evaluations by the clinicians a[t] Bullock, that Mr. Towles should continue his current pain management regimen.

Mr. Towles submitted a sick call request form dated March 5, 2015, asking for the renewal of his pain medications. The medical staff evaluated Mr. Towles on March 6, 2015, during sick call, at which time he requested a renewal of his pain medications for his right knee. After an evaluation of Mr. Towles' right knee, the medical staff referred Mr. Towles to me for renewal of his medications. I saw Mr. Towles that same day, at which time he continued to complain of discomfort in his knee and requested a renewal of his Ultram medication, which I provided him at the time. Again, my exam did not reveal any evidence of any specific condition or defect causing his complaints of pain and discomfort in his knee.

When the medical staff last saw Mr. Towles on March 13, 2015, he denied any problems of any kind and also refused to undergo an eye exam. As of the date of this affidavit [- April 14, 2015 -] Mr. Towles is receiving the medication Tramadol, also known as Ultram, for pain, which he receives three times per day. The orders included within Mr. Towles' medical records demonstrate that he consistently received pain medication for his complaints of right knee pain.

In addition to the pain medications prescribed for him, which he represented as a solution to his complaints of pain, Mr. Towles received bottom bunk profiles and no standing profiles which limited his physical activity.

Additionally, it is evident that Mr. Towles displays a certain level of paranoia related to his medical condition. Notably, he is currently receiving care by the mental health staff for paranoia. Nevertheless, the medical staff has attempted to continue to limit his anxiety and concerns about his condition. During a one year period ending August 29, 2014, the medical staff responded to Mr. Towles' repeated complaints of pain in various areas and extremities by

ordering him to undergo a total of ten x-rays, i.e. almost one x-ray per month.

Based upon the medical care and treatment provided to Mr. Towles, I simply do not agree with the allegations included in his Complaint. With regard to Mr. Towles' specific allegations, I did not neglect him in any way when he voiced complaints regarding his knee pain. I routinely evaluated and examined Mr. Towles' knee and provided Mr. Towles with prescription medications when appropriate. I did not at any time ignore any request by Mr. Towles for medical treatment while he was under my care. I did not and have not deliberately ignored any medical complaints made by Mr. Towles or interfered in any way with the provision of care to Mr. Towles at any time. I have not taken any action which has caused Mr. Towles to experience any unnecessary pain and/or suffering. At all times during his incarceration at Bullock, I listened to Mr. Towles' complaints, undertook thorough physical examinations of him and provided directives and medication when appropriate to control the symptoms which he communicated to me. . . .

*Exh. 3 to the Defendants' Special Report - Doc. No. 20-3* at 2-6 (citations to medical records

and paragraph numbering omitted). In a subsequent affidavit addressing additional claims

presented by Towles, Dr. Siddiq avers:

I have received a variety of documents filed by Mr. Towles and reviewed them in an attempt to discern exactly what his complaints are in this case. However, many of his complaints I still cannot understand. From my reading of the documents, it appears that Mr. Towles is complaining about treatment for an alleged "separated shoulder."

Mr. Towles claims the medical staff delayed in providing him with medical attention for an alleged separated shoulder, including consultation with an orthopedic specialist. Specifically, Mr. Towles claims it was "weeks" after the medical staff received an x-ray report regarding his right shoulder before he saw a member of the medical staff. Unfortunately, Mr. Towles provides a less than accurate recitation of the events which transpired related to his complaints of shoulder pain. First, Mr. Towles underwent an evaluation on February 19, 2014, for complaints of shoulder pain, which resulted in an order for an x-ray of his shoulder. The shoulder x-ray only revealed a prior right shoulder separation, which the radiologist described as "mild." It is not uncommon to have a patient with an old injury like a shoulder separation, which may cause some level of discomfort, and the reason we continued Mr.

7

Towles' pain management with Ultram.  However, there is no indication of any malefaction, misalignment or other defect in his shoulder which would warrant an off-site consultation of any kind.

It appears to me that, in some ways, Mr. Towles, associates his "abdominal pain" with the shrapnel located in the connective tissue of his liver.  For example, an abdominal CT conducted on July 15, 2013, at Bullock County Hospital found shrapnel in the "falciform ligament" which separates the left and right lobe of the liver.  First, it is nearly impossible that this foreign body would cause any level of pain given that it is lodged in the connective tissue of the liver and the liver itself has an extremely limited nerve system. In layman's terms, there is little, if any, sense of feeling in large portions of the liver.  Secondly, there is no indication that the foreign object in the connective tissue of the liver is impacting his liver or gastrointestinal function in any way. Therefore, in my professional opinion, the foreign body in the connective tissue of the liver does not warrant any further treatment or monitoring unless Mr. Towles' symptoms change in some way.

Between the spring and fall of 2013, I along with the other members of the medical staff, routinely saw Mr. Towles for complaints of abdominal discomfort.   There is little question that Mr. Towles suffers from gastrointestinal reflux for which he has received medication.  However, on the occasion I have evaluated him for these complaints, I could not find any other medical explanation for his complaints of abdominal discomfort other than gastrointestinal reflux.  For example, I saw Mr. Towles on April 15, 2013, regarding his complaints of abdominal pain, but at the time, he denied any symptoms (i.e. fever, vomiting, loss of appetite, constipation) other than discomfort. Mr. Towles was also evaluated three times from mid-July through mid-August of 2013 regarding abdominal pain and voiced no complaints of constipation or loss of appetite.  When I saw Mr. Towles on August 28, 2013, he specifically told me that "pain meds help."  Again, I continue to believe that this is an issue of his reliance upon Ultram, which, as I informed Mr. Towles, can cause some gastrointestinal upset.

I addressed Mr. Towles' claim regarding alleged inadequate medical care for his knee at length in my first affidavit.  Despite continuing to see Mr. Towles for his complaints of knee pain, nothing has changed with respect to my findings since the date of my first affidavit.  Mr. Towles claims he underwent one or multiple prior surgical procedures regarding his right knee. Mr. Towles' radiology report dated August 29, 2014, concludes "normal right knee," but Mr. Towles simply writes on the document submitted to the Court, "Osteo[sic] Arthritis in Knee."  It remains unclear why he made this notation.

8

Mr. Towles submitted a sick call request form dated April 2, 2015, complaining of knee pain and he was evaluated during sick call the very same day. Mr. Towles submitted another sick call request form related to his knee on May 2, 2015 and was evaluated the next day during sick call. When I evaluated Mr. Towles on May 4, 2015, he complained of continuing knee pain, but only requested the renewal of his Ultram, which he reported did control his discomfort. I also provided him with a profile requiring his placement in a bottom bunk and no prolonged standing. As stated previously, I have not found any evidence or objective data providing me with any basis to order any further diagnostic testing as it relates to Mr. Towles' knee such as orthopedic consultation or further imaging studies.

Mr. Towles' new documents also mention some complaint about him expelling gas. Mr. Towles submitted a sick call form dated May 17, 2015, requesting to see me "about my gas problem." As indicated in the sick call request, [medical personnel] had evaluated Mr. Towles' complaint regarding gas a couple of weeks earlier. . . . [T]he exam [of Mr. Towles on May 17, 2015] did not reveal any condition, injury or trauma causing his gas discomfort, which was likely attributable to his diet. The allegations asserted by Mr. Towles regarding my conduct during the course of the examination and the statements that I made are entirely fabricated. Furthermore, I did not witness any member of the nursing staff laughing or engaging in any behavior which was directed at Mr. Towles.

In my opinion, this case is primarily about Mr. Towles' insistence upon remaining on pain medication. He admits in one document he filed that "the Ultram helped my pain [and] took the edge off. . . ." I remain concerned that the pain medication will become less effective over time if he continues to rely upon it too heavily. Therefore, Mr. Towles is currently receiving Ultram twice daily.

In addition to the foregoing, Mr. Towles raises a variety of other issues in passing related to the medical treatment he sought and received during his incarceration at Bullock which are, for all practical purposes unintelligible and Mr. Towles provides no facts or explanation as to his passing references to these various other conditions. For example, Mr. Towles complains of (a) an enlarged prostate; (b) a scarred left lung; (c) a cyst or polyp on his right sinus; (d) fluid in "left maxillary occipital lob[e] (in the Brain)"; and (e) MRSA infection resulting in a week long hospital stay. These allegations apparently arise solely from his reading of his medical records which he clearly does not understand. For example, an MRI study of Mr. Towles' brain on April 23, 2013, for general evaluation of an altered mental status, showed some fluid

retention which the radiologist attributed to a prior injury. However, the presence of this fluid does not constitute anything requiring further medical attention and practically could not constitute the source of Mr. Towles' reported altered mental status.

As I stated in my original affidavit, I did not neglect Mr. Towles in any way when he voiced any medical complaints. I routinely evaluated and examined Mr. Towles and provided Mr. Towles with prescription medications when appropriate. I did not at any time ignore any request by Mr. Towles for medical treatment while he was under my care. I did not and have not deliberately ignored any medical complaints made by Mr. Towles or interfered in any way with the provision of medical care to Mr. Towles at any time. . . . At all times during his incarceration at Bullock, I listened to Mr. Towles' complaints, undertook thorough physical examinations of him and provided directives and medication, when appropriate, to control the symptoms which he communicated to me. Based upon my various examinations of Mr. Towles, I continue to maintain that I, along with the other members of the medical staff at Bullock, have provided Mr. Towles with all of the necessary medical attention, care and treatment which he required.

*Exh. 2 to the Defendants' Supplemental Special Report - Doc. No. 58-1* at 2-5 (citations to

medical records and paragraph numbering omitted).

On August 20, 2015, Dr. Siddiq filed a supplemental affidavit in which he provides

additional information regarding Towles' claims alleging denial of treatment and/or refusal

of referrals to free-world specialists for treatment of his hypothyroidism, deep vein

thrombosis, trauma to his frontal lobes, an enlarged prostate, a dislocated wrist, the presence

of a metallic object in his liver and the diet provided to him after dental surgery. In this

affidavit, Dr. Siddiq states that:

At the outset, I must state that I have conducted a review of Mr. Towles' medical records and cannot identify any medical or factual basis for his claims. The issues raised by Mr. Towles which are addressed in this Affidavit are issues which are largely non-issues. I cannot identify any

10

medical basis to conclude that I or the other members of the medical staff at Bullock failed or refused to provide Mr. Towles with any medical treatment. On each occasion that Mr. Towles submitted a sick call request form, we responded with a sick call evaluation, diagnostic testing (if warranted), imaging testing (if indicated) and multiple follow-up examinations and appointments in many instances. While I understand that Mr. Towles has filed a lawsuit and made ceratin allegations related to the actions of the medical staff at Bullock, I would not withhold care or provide anything less than fully adequate medical care to Mr. Towles during his incarceration at Bullock Correctional Facility.

The Master Problem List set forth in each inmate's medical records, including Mr. Towles' medical records, generally identifies the medical and/or mental health diagnoses received by an inmate during the course of their incarceration within the ADOC system. As it relates to Mr. Towles, he raised a wide variety of alleged issues and/or medical conditions for which he is seeking some form of additional treatment and/or off-site referral; however, only two of those conditions appear in his problem list. As indicated on his Master Problem List, Mr. Towles indicated some diagnosis with hyperthyroidism on April 17, 2013.

Also, as indicated in the Medical Coding Assessment Guides included within Mr. Towles' medical records, the various individuals who have evaluated Mr. Towles have always concluded that he is a "generally healthy" individual, excluding the short period of time when he was on a medical hold due to []pendency of off-site referrals and pending medical testing.

Additionally, Mr. Towles received a diagnosis of an MRSA infection on April 22, 2013. MSRA stands for "methicillin-resistant staphylococcus aureus."

In the paragraphs that follow, I will address each of the issues raised by Mr. Towles separately.

Hypothyroidism . . .: Mr. Towles apparently makes the allegation related to hypothyroidism entirely based upon his reading of certain documents from his April, 2013 admission to Jackson Hospital in Montgomery. It is not based upon any actual medical test, any lab report or any documented medical opinion offered by any physician.

Hypothyroidism is a known medical condition caused by an insufficient production of hormones by the thyroid gland. While the condition usually appears in older women, it is also possible in men and is typically associated with symptoms of fatigue, weight gain, low blood pressure, decreased respirations, and decreased temperature.

Hypothyroidism is not necessarily life threatening, though it can in very rare instances develop into a condition known as myxedema which can be life threatening. Hypothyroidism is usually diagnosed through a series of blood tests. It is treated typically through the use of synthetic thyroid hormones which restore the adequate hormone levels within the body.

It is indisputable that Mr. Towles indicated to medical personnel at Jackson Hospital in April of 2013 that he had previously been diagnosed with hypothyroidism. We have not received any documentation to support such a conclusion. In fact, the medical staff at Jackson Hospital only noted that they would check his particular labs for evidence of hypothyroidism and resume medications for this condition after checking his lab results. Moreover, the medical staff at Bullock does not currently possess documentation that confirms a diagnosis of hypothyroidism. When the Bullock medical staff initially believed that Mr. Towles' representation of a prior diagnosis was confirmed at Jackson Hospital, it provided him with the appropriate medication - Synthroid. However, it is now evident that there is no medical evidence of any kind that Mr. Towles has hypothyroidism and, as such, we cannot treat a condition which Mr. Towles does not have. Stated differently, Mr. Towles does not require any further medical treatment for hypothyroidism or a referral to an off-site specialist because he does not suffer from hypothyroidism.

Deep Vein Thrombosis . . .: Like Mr. Towles' allegation that he suffers from hypothyroidism, he also claims he suffers from deep vein thrombosis based upon a non-specific note from the April, 2013 notations from Jackson Hospital. However, this note appears to be more intended to treat any potential leg clots (in laymen's terms) which Mr. Towles might develop during his hospital stay in April of 2013. In very basi[c] terms, certain individuals (including individuals [on] certain medications) who lie in bed for extended periods of time are at risk for developing blood clots and/or circulatory issues in their legs and feet. For that reason, hospital patients often receive compression hose. I have read the notation in the Jackson Hospital records, which indicates to me an instruction to the medical staff to monitor Mr. Towles for this condition during his hospitalization. Based upon my review of his medical records, his medical history and my multiple exams of him, I have not seen any evidence of any kind that he has ever suffered from or is currently suffering from deep vein thrombosis.

"Trauma to Frontal Lobes" . . .: While hospitalized at Jackson Hospital in April of 2013, Mr. Towles underwent an MRI of his brain with and without contrast due to his altered mental status. The radiologist recorded certain

findings from the MRI which are included in a MRI report, which is the apparent basis for Mr. Towles' allegations related to the issues with "trauma to frontal lobes." The specific finding included in the MRI results from the MRI of Mr. Towles' brain includes the following sentence:

> "[t]here is encephalomalacia that may be related to previous trauma or infraction that involves both frontal lobes."

In the impression section of this MRI report, the radiologist further states that the encephalomalacia is "minimal" in the right occipital lobe.

Encephalomalacia as it relates to the frontal lobes is generally known as the softening of brain tissue as a result of a prior head injury of some kind. However, many individuals with encephalomalacia of the frontal lobes do not display any signs of trauma, dysfunction or mental logical deficit. In this particular instance, the MRI of Mr. Towles' brain on April 23, 2013, simply confirmed a prior injury. It did not serve to confirm or indicate any existing condition. Moreover, Mr. Towles has not reported any signs or symptoms which would indicate to me that these findings were related to any injury he sustained during his incarceration at Bullock or his incarceration in the ADOC custody. Based upon all of my interactions with Mr. Towles, it has been evident to me that Mr. Towles, despite having some mental health related issues which are being addressed by the mental health staff at Bullock, does not have any symptoms or display any evidence of any significant neurological deficit that would be related to a recent brain injury or encephalomalacia that he experiences as a result of some prior head trauma. Therefore, in the absence of any objective medical evidence that Mr. Towles is suffering from any symptoms or any particular maladies related to some sort of prior brain injury, I could not justify referring him to an off-site specialist. In short, there is no evidence of any kind based upon my numerous interactions with Mr. Towles that he is suffering from any condition which would in any way be related to any trauma or abnormalities with the frontal lobes of his brain. As such, no further treatment (including an off-site specialty referral is warranted).

An "enlarged prostate" . . .: I have attempted to determine exactly how Mr. Towles reached his conclusion that he is experiencing an enlarged prostate. This conclusion is without any support in his medical records. He has not submitted any sick call request forms complaining of (a) an enlarged prostate, or (b) any of the symptoms typically associated with an enlarged prostate. . . . . As the Court can see from Mr. Towles' voluminous sick call requests, he has voiced a wide variety of complaints, but persistent complaints of difficulty urinating are totally lacking. Again, there is no evidence that Mr.

Towles suffers from an enlarged prostate and, therefore, I cannot provide any further treatment or off-site referral for a medical condition for which he does not display any symptoms and, for which, he has not tested positive.

"[D]islocated right wrist which remains misaligned with a protruding bone" . . .:  The medical staff [at Bullock] received a sick call request form dated December 9, 2013 in which Mr. Towles first reported falling in the shower and claiming that a bone in his wrist was "sticking up."  Mr. Towles appeared for evaluation during the chronic care clinic held on December 9, 2013.  At the time of the December 9, 2013, chronic care appointment, Mr. Towles reported falling approximately two days prior to the evaluation when he jumped off his bunk.  Mr. Towles reported to the member of [the] medical staff conducting chronic care clinics at that time that there was a bone sticking out of his hand that he had another inmate pull which caused the bone to go down.  Prior to December 9, 2013, there is no record in Mr. Towles' medical records of him having any injury to his right wrist.  The nurse practitioner entered orders for Mr. Towles to undergo an x-ray of his right wrist on December 9, 2013.

Mr. Towles underwent an x-ray of his . . . right wrist on December 9, 2013 - i.e. the same day as the order for the x-ray of his right wrist.  As indicated in the radiology report from the wrist x-ray, the x-ray was "**Grossly unremarkable** ...."  The x-ray of Mr. Towles' right hand taken at the same time did reveal some prior injury to his right hand, which appeared to be pre-existing and was not the result of any recent injury or any trauma which could be surgically repaired.

Mr. Towles submitted a sick call request form dated December 16, 2013 in which he complained of pain and swelling in his right wrist.  Mr. Towles was evaluated for right wrist pain on December 17, 2013 by a member of the nursing staff.  At that time, Mr. Towles specifically stated to the nursing staff that his wrist was not "hurting," and he requested some sort of "wrist bracelet."  Following this sick call evaluation, Mr. Towles was referred to a practitioner for further evaluation.

The nurse practitioner at Bullock examined Mr. Towles again on December 23, 2013, at which time he continued to complain of a limited range of motion in his right wrist.  Upon examination, the nurse practitioner did not notice any obvious signs of fracture or trauma and, therefore, ordered a [splint] for him and ordered him to undergo x-rays.  The nurse practitioner also ensured that Mr. Towles received a dosage of pain medication sufficient to control his right wrist discomfort.

Mr. Towles returned for a follow up appointment with the medical staff

14

on January 13, 2014, at which time he continued to complain of right wrist pain and a limited range of motion. During the course of this appointment, the nurse practitioner read the radiology report to Mr. Towles. The nurse practitioner also offered Mr. Towles to continue to rely upon the splint that had been provided to him and instructed him to notify the medical staff if his symptoms should change in any way.

When Mr. Towles submitted a sick call request form dated January 25, 2015, he did not mention anything related to his right wrist. Mr. Towles submitted a sick call request form dated January 29, 2015, complaining about an infection in his jaw and the need for additional glasses as well as some problem with his "thumb." The sick call request form indicates that Mr. Towles is indicating a problem with his left thumb. However, the January 29, 2015, sick call request form mentions nothing about a wrist problem. When Mr. Towles appeared for evaluations by the nurse practitioner on February 5, 2014, and February 19, 2014, he did not mention any complaints of any kind related to his right wrist.

In sum, Mr. Towles' right wrist is not dislocated. He has not sought or required medical treatment for his right wrist between the winter of 2014 and the filing of this action. He requires no orthopedic consultation and his claim in his regard is without any medical support. The x-ray of his right wrist on December 9, 2015, directly disproves his allegations in this regard.

Referral to "free-world surgeon for removal of the metallic object from his liver" . . .: It appears to me that, in some ways, Mr. Towles associates his "abdominal pain" with the foreign body located in the connective tissue of his liver. For example, an abdominal CT conducted on July 15, 2013, at Bullock County Hospital found shrapnel in the "falciform ligament" which separates the left and right lobe of the liver. First, it is nearly impossible that this foreign body would cause any level of pain given that it is lodged in the connective tissue of the liver and the liver itself has an extremely limited nerve system. In layman's terms, there is little, if any, sense of feeling in large portions of the liver. Secondly, there is no indication that the foreign object in the connective tissue of the liver is impacting his liver or gastrointestinal function in any way. Therefore, in my professional opinion, the foreign body in [] the connective tissue of the liver does not warrant any further treatment or monitoring unless Mr. Towles' symptoms change in some way.

In Doc. 61, filed on June 19, 2015, Mr. Towles goes as far as claiming that the medical staff has "ignored" the metallic object in his abdomen. This is simply untrue.

Mr. Towles appeared for sick call evaluation on April 12 and April 13,

15

2013, at which time he complained of right upper right quadrant pain and received an evaluation by a member of the medical staff and a referral for further evaluation by the medical staff. Shortly thereafter, he was hospitalized as referenced above. During his April, 2013, hospital stay at Jackson Hospital, the Jackson Hospital staff ordered an abdominal x-ray which revealed a "metallic pellet like structure in the right upper quadrant." However, his complaints were fairly infrequent and non-specific and the sheer presence of a foreign body (as mentioned above) did not warrant immediate investigation or further treatment. Nevertheless, between April and May, 2013, we continued to monitor his condition and other medical conditions.

An ultrasound of Mr. Towles' abdomen conducted on June 13, 2013 was normal in all respects. On June 17, 2013, Mr. Towles was evaluated for complaints of upper quadrant pain which he claimed [was] associated with some foreign object lodged in his abdomen. As noted by the medical staff conducting an evaluation on June 17, 2013, Mr. Towles had undergone an ultrasound four days prior to June 17, 2013 and the medical staff continued to provide him with pain medication to control his complaints of discomfort. The medical staff saw Mr. Towles again on June 27, 2013 at which time he continued to complain of upper quadrant pain and requested a more significant medication to treat his pain. At the conclusion of this appointment, Mr. Towles received additional pain medications. I and other clinicians continued to follow up with Mr. Towles through July of 2013 while he continued to complain of upper quadrant pain which resulted in a referral to an off-site gastroenterologist for further evaluation.

Mr. Towles underwent a CT of his abdomen on July 16, 2013, which simply confirmed the presence of a metallic foreign body "within the falciform ligament consistent with a prior gunshot injury." The radiologist report from the CT scan specifically states that there was no "abscess or other abnormality identified around this bullet."

As a result of his continuing complaints and after receiving the CT report, I referred Mr. Towles to an off-site gastroenterologist. This off-site gastroenterologist evaluated Mr. Towles on July 23, 2013 at which time he recommended a colonoscopy and a further investigation of Mr. Towles' gastrointestinal tract with an imaging study known as an EGD. An EGD is technically known as an esophagogastroduodenoscopy, which is simply a test to examine the lining of the esophagus, stomach and the initial portion of the small intestine.

As indicated in Mr. Towles' medical records, he met with a member of the medical staff after undergoing the colonoscopy and EGD at which time he

was informed that there were no findings of any abnormalities as a result of these studies except for the presence of the foreign body. Despite the absence of any objective medical data supporting Mr. Towles' claim of continuing pain as a result of a metallic object in his body, the medical staff continued to provide him with pain medication even as of August 28, 2013, following his normal colonoscopy and EGD. In sum, there is no evidence of any abscess, infection or other problem associated with the foreign body lodged in Mr. Towles' abdomen. If further treatment was warranted with an off-site specialist, it would have been ordered by the gastroenterologist who saw Mr. Towles in July of 2013. In this instance, Mr. Towles received exactly what he is requesting - an off-site consultation which concluded that no further care was warranted.

  <u>Denial of a "proper diet since his dental surgery" . . .</u>: Mr. Towles is fairly specific in his complaints that "medical doesn't care" as it relates to his alleged difficulties eating and "staying hungry." (Doc. No. 37 at pg. 3). Mr. Towles specifically alleges that the issues pertaining to his diet following his extraction of his tooth constitutes a denial of "proper medical treatment." (Doc. No. 37 at pg. 3). Mr. Towles raised these exact same allegations in Doc. No. 85, filed on July 9, 2015. However, he now acknowledges that he "can now chew some of the food" though he still experiences some degree of pain associated with his gums. (Doc. No. 85 at p. 1).

  One of the problems where the plaintiff relates to his inconsistent descriptions is his alleged discomfort. For example, Mr. Towles, despite insisting that he was entitled to a "mechanical soft diet," submitted a sick call request form around March 9, 2015, at which time he wrote, "I can't even eat the mechanical soft diet." Therefore, it goes without saying, that plaintiff could not have known of his inability to eat "the mechanical soft diet," unless he was in fact receiving the mechanical soft diet as prescribed.

  The history of the attention provided to Mr. Towles regarding his requests for a diet is clear. On January 12, 2015, the nurse practitioner saw Mr. Towles for complaints of lower left jaw pain at which time he received a referral to the dentist, an antibiotic as well as continuing pain medications for his discomfort. On February 7, 2015, Mr. Towles submitted a sick call request form requesting to see me relating to his "special diet change," and his complaints that he was still hungry following the "change" of his diet by the medical staff. Mr. Towles specifically acknowledged receiving a "special diet" in a sick call request form dated February 8, 2015. In his sick call request form, Mr. Towles wrote, "I need to be seen … about my special diet that i[']m on **now**."

There is no question that orders were entered by the medical staff to ensure that Mr. Towles received a mechanical soft diet. In an order dated March 10, 2015, the nurse practitioner specifically noted her order for Mr. Towles to receive a "bland/mechanical soft diet [times] 30 days." Three days later, the nurse practitioner entered a separate order in which she amended her prior order directing the kitchen steward to ensure that Mr. Towles received a supplemental sandwich in addition to his mechanical soft diet for a period of thirty days.

More importantly, Mr. Towles' recent complaints have subsided and changed. When Mr. Towles requested to see the dentist for complaints of continuing tenderness around his mouth in April of 2015, he did not mention any requests for any type of special diet. On May 13, 2015 I saw Mr. Towles related to several complaints including his complaints related to continuing dental pain. In response to those complaints, I wrote specific orders for Mr. Towles to receive a mechanical soft diet and I then instructed Mr. Towles to follow up with Dr. Mendel as needed. Mr. Towles submitted a sick call request form on May 16, 2015, indicating that a nurse wrote an order for Mr. Towles to receive three sandwiches at night because of difficulty eating. As recently as August 3, 2015, Mr. Towles submitted a sick call request form once again discussing his mechanically soft diet. In his sick call request form, Mr. Towles wrote, "I need to see [Doctor] . . . to get my diet changed from mechanical soft 2100 to wellness diet. [M]y mouth is better from dental. I can chew now [some]." In short, there is no evidence that I or any other member of the medical staff ever refused to provide Mr. Towles with a mechanical soft diet, as requested. In fact, the medical records and Mr. Towles' handwritten statements in his records confirm that he requested and received orders [for] a special diet [and extra food at night].

"[S]carred left lung" . . .: This allegation raised by Mr. Towles also arises from his misunderstanding of an imaging study conducted in April of 2013. Again, the chest x-ray in question merely states that he has some "minimal scarring" in his lower left lung and, most importantly, it was "unchanged" from the prior study utilized by the radiologist. First, there is no medical protocol or treatment regimen for "mild scarring" of a lung. In simple terms, scars are healed wounds and there is no evidence of any further scarring which is causing any respiratory issue. Again, Mr. Towles raises a myriad of complaints but none related to respiratory function and, as such, there is no objective medical data to conclude that he is suffering from any medical condition associated with this finding which warrants any further medical treatment or attention of any kind.

18

"[C]yst/polyp in his right sinus" . . .:  The April 23, 2013, MRI report from the MRI of Mr. Towles' brain taken at Jackson Hospital also indicates some issues with regard to his left maxillary sinus.   In particular, the radiologist noted the presence of a possible mucus retention cyst or polyp in the right maxillary sinus.   With regard to the left maxillary sinus, the radiologist simply noted the presence of some mucus or fluid.  The findings are not unusual.  In particular, the presence of a mucus retention cyst or polyp is not unusual.  Patients typically do not require surgery with regard to these conditions as they are surgically treated only in instances where there are certain signs of symptoms, including, but not limited to, chronic sinus infections.  As indicated throughout Mr. Towles' medical records, which I reviewed in preparing this affidavit, Mr. Towles has not indicated the degree or type of history necessary to warrant surgical treatment of a condition which is not causing any type of sinus issues with him.   Moreover, as indicated through the sick call request forms filed by Mr. Towles throughout his incarceration, he has not complained at any time of any signs or symptoms which would in any way be related to the presence of a mucus retention cyst or polyp in his sinuses.

Once again, Mr. Towles' allegations related to his sinuses and/or the presence of an alleged cyst or polyp in his right sinuses is nothing more than a misreading of a radiology report.  In this particular instance, the radiologist noted findings which are not unusual for any MRI of an individuals' head or brain.  For example, if an individual had a common cold, these findings would be entirely normal or expected.  In short, Mr. Towles has not submitted any sick call request forms complaining of any symptoms of any kinds which would warrant a treatment for sinus drainage as noted in this MRI.  Moreover, there is no evidence of any kind to support that any mucus retention cyst or polyp in his right maxillary sinus is causing him any complications of any kind or warrants any further treatment of any kind.  It is important to also note, this MRI of Mr. Towles' brain was done over two years ago and, since that time, Mr. Towles has not complained of any signs of symptoms that would be in any way related to these conditions.  Therefore, I cannot identify any medical justification for (a) providing any further treatment of any kind to Mr. Towles for sinus congestion that was present on April, 2013 (more than two years ago), or (b) a mucus retention cyst or polyp which has not caused any symptoms or difficulties of any kind with respect to Mr. Towles over the last two and a half years.

"MRSA infection" . . .:  Mr. Towles allegations related to a prior MRSA infection clearly related to a *prior* infection.  I have reviewed his recent

examinations and my notes from those examinations and cannot identify any signs or symptoms or complaints that indicate or suggest in any way that he is currently experiencing any type of MRSA infection. The medical records further document that these prior infections were treated entirely appropriately with dressing changes and antibiotics. Sending Mr. Towles to a specialist for MRSA at this stage would be akin to sending a patient to a specialist for an episode of the flu that the patient experienced several months ago and for which he or she no longer suffers any symptoms. In sum, there is no basis for his claim that he should have received any different treatment ([from that provided] which obviously resolved his infection).

As stated previously, it is evident that Mr. Towles displays a certain level of paranoia related to his medical condition. Notably, he is currently receiving care by the mental health staff for paranoia. Nevertheless, the medical staff has attempted to continue to limit his anxiety and concerns about his condition. During a one year period ending August 29, 2014, the medical staff responded to Mr. Towles' repeated complaints of pain in various areas and extremities by ordering him to undergo a total of ten x-rays, i.e. almost one x-ray per month.

Based upon the medical care and treatment provided to Mr. Towles, I simply do not agree with the allegations included in his Complaint. With regard to Mr. Towles' specific allegations, I did not neglect him in any way when he voiced complaints regarding his knee pain. I routinely evaluated and examined Mr. Towles' knee and provided Mr. Towles with prescription medications when appropriate. I did not at any time ignore any request by Mr. Towles for medical treatment while he was under my care. I did not and have not deliberately ignored any medical complaints made by Mr. Towles or interfered in any way with the provision of medical care to Mr. Towles at any time. I have not taken any action which has caused Mr. Towles to experience any unnecessary pain and/or suffering. At all times during his incarceration at Bullock, I listened to Mr. Towles' complaints, undertook thorough physical examinations of him and provided directives and medication, when appropriate, to control the symptoms which he communicated to me. Based upon my various examinations of Mr. Towles, I can state to a reasonable degree of medical certainty that I and the members of the medical staff at Bullock have provided Mr. Towles with all of the necessary medical attention, care and treatment which he required.

*Exh. 1 to the Defendants' Fourth Supplemental Special Report - Doc. No. 115-1 at 2-16*

(citations to medical records and paragraph numbering omitted) (emphasis in original).

Dr. Siddiq filed a final affidavit on September 10, 2015 as a supplement to his prior affidavits in which he further addresses the claims presented by Towles regarding the medical treatment provided on July 22, 2015. In this affidavit, Dr. Siddiq states that:

> The medical staff received [a] sick call request form from Mr. Towles on the afternoon of July 21, 2015 [seeking an appointment with Dr. Siddiq regarding various complaints, including pain in his right knee and shoulder, jock itch, itchy spots and dandruff]. Mr. Towles then reported to sick call on July 22, 2015, where he was initially screened by a member of the nursing staff and then referred to me for evaluation.
>
> I saw Mr. Towles on July 22, 2015, in response to his July 21, 2015, sick call request form. As indicated in my notes from this interaction, Mr. Towles first requested muscle rub, which he believed was needed for his "swollen knee." However, I closely examined Mr. Towles' knee for swelling, comparing his right knee to his left to see any noticeable signs of swelling or fluid buildup. I also applied light pressure to test for any swelling. Based upon my examination, there were no visible signs of swelling or trauma to Mr. Towles' right knee.
>
> July 22, 2015, was not the first occasion that we (members of the Bullock medical staff) saw Mr. Towles for knee pain. Mr. Towles' complaints of knee pain originate as early as June of 2014, more than a year prior. In the months that followed (i.e. between June and August of 2014), we saw Mr. Towles on at least five (5) different occasions for complaints of knee pain. Throughout this period of time, examinations of Mr. Towles' right knee (like the examination conducted on July 22, 2015), did not reveal any injury, deformity, defect, swelling, misalignment, malformation, dysfunction or any other treatable medical condition. In August of 2014, the nurse practitioner at Bullock even ordered an x-ray of Mr. Towles' right knee which did not reveal any underlying condition mandating any type of further treatment. Despite the numerous examinations of Mr. Towles' right knee prior to July of 2015, we could not identify any treatable medical condition with respect to his knee. So, when Mr. Towles appeared in July of 2015, without any meaningful change in his condition, my conclusion did not change. I could not identify any signs or symptoms on July 22, 2015, to otherwise alter my conclusion that Mr. Towles was not suffering from any treatable condition as it related to his right

21

knee.

      The allegations by Mr. Towles regarding my interaction with him on July 22, 2015 are simply not true.  I never told Mr. Towles that I would not treat him or that I would not "do anything" for his right knee. I did not raise my voice, yell or scream at Mr. Towles. I did not refuse to listen to Mr. Towles during this appointment.  I did not ask any ADOC officer to remove Mr. Towles from the examination room or the health care unit.  I did not discontinue any orders of any kind and I did not withdraw any prior orders.  I did not terminate any profiles issued to Mr. Towles.  In fact, in my interactions with Mr. Towles, I have never engaged in such conduct.

      Mr. Towles assigns some level of significance to the fact that the nursing staff referred him to me, but this referral is standard for any type of orthopedic type complaint.  The fact that the nursing staff referred Mr. Towles to me does not indicate any conclusion by the nursing staff that Mr. Towles suffered from any condition of any kind.  In the case of Mr. Towles, he was referred to me because he was complaining of knee pain and the nursing protocols do not permit the nursing staff to address the type of complaints made by him at that time.

      At the conclusion of the appointment on July 22, 2015, I instructed Mr. Towles to notify the medical staff if his condition changed in any way.  My response to Mr. Towles' complaints on July 22, 2015, was consistent with the decisions made over the course of the prior year.  My conclusion at that time was based exclusively upon my examination of Mr. Towles and my medical judgment.  My conclusion that he was not suffering from any treatable medical condition was not the result of this lawsuit or anything related to this lawsuit.

      As I have stated previously, I have not ignored Mr. Towles' complaints or refused to provide any form of necessary medical treatment to Mr. Towles. However, I can only provide treatment for conditions for which Mr. Towles manifests some symptoms.  With respect to his right knee, Mr. Towles showed no treatable symptoms. . . .  I have not and will not retaliate against Mr. Towles or make any decision in treating Mr. Towles as my patient based upon the existence of this lawsuit.

*Exh. 1 to the Defendants' Fifth Supplemental Special Report - Doc. No. 125-1 at 2-5*

(citations to medical records and paragraph numbering omitted).  The medical records compiled contemporaneously with treatment provided to Towles support the affidavits

submitted by Dr. Siddiq.  In addition, despite Towles' allegation that Nurse McNeil and Officer Salter witnessed Dr. Siddiq act in an unprofessional manner during the evaluation on July 22, 2015, neither of these individuals observed any such action.  *Exh. 2 to the Defendants' Fifth Supplemental Special Report - Doc. No. 125-2* at 3; *Exh. 3 to the Defendants' Fifth Supplemental Special Report - Doc. No. 125-3* at 2.

Turning to the first prerequisite for issuance of preliminary injunctive relief, the court finds that Towles has failed to demonstrate a substantial likelihood of success on the merits of his claims.  Towles likewise fails to establish a substantial threat that he will suffer the requisite irreparable injury absent issuance of the requested preliminary injunction.  The third factor, balancing potential harm to the parties, weighs more heavily in favor of the defendants as issuance of the injunction would have an unduly adverse affect on the ability of prison medical personnel to exercise their professional judgment in determining the appropriate course of treatment for inmates.  Finally, the public interest element of the equation is, at best, a neutral factor at this juncture.  Thus, Towles has failed to meet his burden of demonstrating the existence of each prerequisite necessary to warrant issuance of preliminary injunctive relief.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The motions for preliminary injunction filed by the plaintiff be DENIED.

2.  This case be referred back the undersigned for additional proceedings.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **October 2, 2015**.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1; *see Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Done this 18th day of September, 2015.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE

24