IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROLLAND SEAN TOWLES,           )
AIS #279634,                   )
                               )
        Plaintiff,             )
                               )
   v.                          )        CASE NO. 2:15-CV-146-MHT
                               )                (WO)
                               )
DR. BOB MENDEL, et al.,[1]      )
                               )
        Defendants.            )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION[2]

This 42 U.S.C. § 1983 action is before the court on a complaint and amendments

thereto filed by Rolland Sean Towles ("Towles"), an indigent state inmate.[3] Dr. Bob

Mendel, Towles' on-site dentist; Dr. Tahir Siddiq, the Medical Director at Bullock; and

Jessica Duffell, the Health Services Administrator for Bullock, are named as defendants.

In the instant complaint, Towles alleges that the defendants denied him adequate

treatment for a myriad of conditions, including right knee pain, removal of an impacted

wisdom tooth, follow-up care for the tooth extraction, lack of a soft diet, frontal lobe

---

[1]Although Towles lists Bob Mendle as a defendant, this individual's correct surname is Mendel. In the interest of clarity, the court will refer to this defendant by his correct name.

[2]All documents and attendant page numbers cited herein are those assigned by the Clerk in the docketing process.

[3]During the time relevant to the complaint, Towles was incarcerated at Bullock Correctional Facility. Towles is now incarcerated at Easterling Correctional Facility.

damage, an MRSA infection, a partially separated right shoulder, right wrist pain, gastrointestinal issues, an enlarged prostate, a scarred left lung, a metallic object in his liver, sinus issues and hip pain.[4] He also complains that Dr. Siddiq withheld medical treatment in retaliation for his filing this lawsuit. Towles seeks a declaratory judgment, injunctive relief and monetary damages for the alleged violations of his constitutional rights.

The defendants filed a special report, supplemental reports, responses and relevant evidentiary materials addressing the claims raised by Towles, including numerous affidavits from the defendants and certified copies of Towles' medical records. In these documents, the defendants deny that they acted with deliberate indifference to Towles' medical needs.

After receipt of the defendants' various reports and responses, the court issued an order on September 14, 2015 directing Towles to file a response to the reports, and advised Towles that his response should be supported by affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. No. 128 at 2. The order specifically cautioned the parties that "unless within fifteen (15) days from the date of this order a party files a response in opposition which presents sufficient legal cause why such action should not be undertaken … the court may at any time [after expiration of the time for the plaintiff filing a response] and without further notice to the parties (1) treat the special reports and any supporting evidentiary materials as a motion for summary

---

[4]Towles couches his claims of inadequate medical and dental treatment as violations of his due process rights. However, these claims arise under the Eighth Amendment and are addressed in accordance with the deliberate indifference standard. *See Estelle v. Gamble*, 429 U.S. 97, 105-107 (1976).

judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." Doc. No. 128 at 2-3 (emphasis removed). Towles filed responses to the defendants' reports supported by appropriate evidentiary materials.

Pursuant to the September 14, 2015 order, the court deems it appropriate to treat the defendants' reports as a motion for summary judgment, and concludes that summary judgment is due to be granted in favor of the defendants.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); F.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[5] The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits],

---

[5] Although Rule 56 underwent stylistic changes in 2010, the revision of "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination." *Id*. "'Shall' is also restored to express the direction to grant summary judgment." *Id*. Despite these changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving party has initial burden of showing there is no genuine dispute of material fact for trial). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-32417cv194. A fact is material if it is relevant or necessary to the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes of fact not material to the outcome of a case do not preclude entry of summary judgment in favor of the moving party. *Id*. at 247-248 (The summary judgment "standard provides that the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute] of material fact… . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

The defendants have met their evidentiary burden. The burden therefore shifts to Towles to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by

[citing to materials in the record including affidavits, relevant documents or other materials] the court may … grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Education for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007). In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted).

To proceed beyond the summary judgment stage, an inmate-plaintiff is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting

his claims of constitutional violations. *Anderson*, 477 U.S. at 249; Rule 56(e), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable … or is not significantly probative … summary judgment may be granted." *Anderson*, 477 U.S. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions …, in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (holding that grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due

to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (holding summary judgment appropriate where no genuine dispute of material fact exists). At the summary judgment stage, this court must "consider all evidence in the record … [including] pleadings, depositions, interrogatories, affidavits, etc. – and can only grant summary judgment if [the evidence] in the record demonstrates that no genuine [dispute] of material fact exists." *Strickland v. Norfolk Southern Railway Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d

1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts… . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation, a pro se litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

The court has undertaken a thorough review of all the evidence contained in the record. After such review, the court finds that Towles has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

## III. DISCUSSION[6]

### A. Deliberate Indifference

Towles alleges that beginning sometime in 2012 and continuing through the filing of the instant complaint, the defendants acted with deliberate indifference to his numerous medical needs. In support of this allegation, Towles asserts that the defendants failed to provide him appropriate treatment for his medical conditions and complains that the defendants refused to refer him to free world specialists for evaluation and treatment.

The defendants deny that they acted with deliberate indifference to Towles' medical needs. Instead, the defendants maintain that Towles had continuous access to examination by health care personnel and received treatment from medical professionals for each of his conditions, including evaluations and examinations by members of the nursing staff, evaluations and consultations with the facility physician and dentist, prescriptions for various medications to alleviate his pain and discomfort and treat his

---

[6]The court limits its review to the allegations set forth in the complaint and amendments filed by Towles. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Secretary, Florida Dept. of Corrections*, 502 F. App'x. 905, 909-910 (11th Cir. 2012) (holding that plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (refusing to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

conditions, issuance of medical profiles for a bottom bunk and no prolonged standing, provision of diagnostic and imaging tests — such as x-rays, CT scans, a nuclear medical scan and gastrointestinal tests — deemed necessary to monitor his conditions, and referral to an off-site gastroenterologist for evaluation of his abdominal issues.

To prevail on a claim concerning an alleged denial of medical treatment, an inmate must—at a minimum—show that the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment").

Under applicable federal law, medical malpractice does not equate to deliberate indifference:

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at

1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need … , Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). In seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk of harm to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must show first "an objectively 'serious medical need[]'" … and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted). A medical need

is serious if it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Goebert v. Lee Cty.*, 510 F.3d 1312, 1325 (11th Cir. 2007) (quoting *Hill*, 40 F.3d at 1187).

In addition, "to show the required subjective intent …, a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference' … which is in turn defined as requiring two separate things: 'aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and … draw[ing] of the inference[.]'" *Taylor*, 221 F.3d at 1258 (internal citations omitted) (alterations in original). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, … the Supreme Court has … emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S.

Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (holding that, to show deliberate indifference, the plaintiff must demonstrate a serious medical need and then must establish that the defendant's response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law") (citation and internal quotations omitted). Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (citation and internal quotations omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not

amount to deliberate indifference which violates the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient).

The defendants filed several detailed affidavits addressing the claims presented by Towles. The medical and dental records compiled contemporaneously with the treatment provided to Towles support the affidavits submitted by the defendants.

With regard to Towles' claims regarding the treatment provided for his wisdom tooth, Dr. Mendel provides the following information:

> Mr. Towles submitted a sick call request form dated January 26, 2015, requesting that he see the dental staff, claiming that he had waited more than a month to see the dentist, though I cannot identify [in the records] any prior request for dental treatment which has not been addressed. Mr. Towles submitted a sick all request form dated January 9, 2015 complaining about "an infection" in his jaw. The Bullock medical staff saw Mr. Towles in sick call the following day, January 10, 2015. Upon examination, the sick call nurse noted that Mr. Towles had only recently developed this discomfort and exhibited "minimal swelling to lower jaw." The sick call nurse provided Mr. Towles with a prescription for Motrin and referred him to me for an appointment, which was scheduled for the next available appointment date.
>
> Mr. Towles appeared for an appointment with me in early February of 2015, at which time I determined that Mr. Towles required the extraction of [a] … non-restorable tooth [i.e., tooth number 17,] located in a particularly bad area in his mouth. I, and the dental staff, knew the procedure would likely cause a fair amount of discomfort to Mr. Towles. After extracting the tooth, I was required to apply four sutures to the wound in order to ensure proper healing and his recovery. Three days after the procedure, on February 12, 2015, I saw Mr. Towles again, and examined the location of the procedure, which showed signs of improvement. At that time, I elected to change the dressings in his mouth. The next day (i.e. February 13, 2015), Mr. Towles submitted a sick call request form complaining that the dentist had refused to see him despite being in

discomfort from the prior surgical extraction [even though he had been examined and received treatment from the dentist the previous day]. He was evaluated during sick call on February 15, 2015. At the time of the evaluation, he was referred to me for further follow up care.

I next saw Mr. Towles … on February 15, 2015, at which time he was complaining of pain, and therefore, I applied new dressings to, what appeared to be, a dry socket and increased his pain medication. Oddly, however, Mr. Towles specifically requested the narcotic-like pain medication of Ultram.

The term dry sockets actually refers to the specific condition arising after a surgical procedure when a blood clot fails to form in a location where a tooth is removed, and the alveolar bone is exposed. Dry sockets are a common risk associated with routine dental extractions and [are] an even greater risk when involving impacted molars. In my experience, approximately one-fourth to one-third of patients experience dry sockets after the removal of an impacted molar.

The condition known as "dry sockets" is typically treated with an anti-inflammatory medication coupled with an antibiotic. As I instructed Mr. Towles during the course of his dental examinations and follow up care, it was important for him to avoid eating hard foods, smoking, or otherwise doing anything to cause a hard impact on the area where the surgical extraction occurred.

Mr. Towles submitted a sick call request form dated [sometime] around March 1, 2015, complaining of pain and discomfort in his jaw. The medical staff evaluated Mr. Towles during sick call on March 1, 2015 related to complaints of pain in his gums. When I saw Mr. Towles on March 3, 2015, he reported his complete recovery from the dental procedure. At that time, the signs and symptoms of dry sockets were no longer present. On March 8, 2015, Mr. Towles requested to see the dentist related to his recovery from [the] surgical extraction. On March 9, 2015[,] I saw Mr. Towles again, at which time he reported feeling somewhat better and my examination revealed that the location of the surgical incision looked as though it was healing appropriately.

Though Mr. Towles apparently raised a complaint with the medical staff on May 13, 2015, related to his prior dental extraction, he was requesting that the medical staff provide him with orders for additional food during the day, particularly - an additional sandwich. However, Mr. Towles never voiced or submitted this request to me… .

I did not at any time ignore any request by Mr. Towles for dental treatment. I did not deliberately ignore any dental complaints made by Mr. Towles or interfere in any way with the provision of dental care to him at

any time… . I did not unnecessarily or inappropriately delay in any way in providing him with dental treatment… .

Ex. 2 to the Defendants' Special Report – Doc. No. 20-2 at 2-4 (citations to dental/medical records and paragraph numbering omitted). In a subsequent affidavit, Dr. Mendel further avers that:

As stated in my original affidavit, Mr. Towles reported complaints of discomfort in his lower jaw in January of 2015, at which time he was evaluated and scheduled for an extraction of the diseased molar. Upon evaluation of the diseased molar, I determined that it was a "simple" extraction in my professional opinion that did not warrant referral to an off-site oral surgeon. There are extractions which warrant an outside referral; however, the number of those extractions is small. I confirmed that the extraction would be simple through my assessment of the tooth, the taking of x-rays and evaluating the shape of the tooth and surrounding bone mass. If, for example, the diseased tooth is particularly brittle or in a location where there may be additional work required on the underlying bone, then it may warrant referral to an off-site specialist. In this instance, Mr. Towles' diseased tooth did not exhibit any indicia of complications or otherwise suggest to me that its extraction would be anything other than a typical extraction.

Based upon my evaluation of Mr. Towles, I did not believe at the time, nor do I believe today, that the extraction of the molar constituted anything more than a simple extraction. During the course of my career, I have performed many simple extractions and cannot recall any specific instance when I referred a patient to an oral surgeon for a simple extraction. … Mr. Towles apparently concludes that, because he experienced some degree of post-extraction discomfort and dry sockets, the Bullock dental staff should have referred him to an off-site oral surgeon. This analysis is simply wrong. In my opinion, Mr. Towles would have likely suffered from the same post-surgical condition regardless of whether the extraction was performed on-site at Bullock or at a free-world dental clinic.

I briefly saw Mr. Towles in response to a sick call request form that he submitted [on] April 15, 2015, complaining of continuing discomfort. As with my prior examinations, I did not see any signs or symptoms of infections and complications. Each time I saw Mr. Towles after the initial extraction, he expressed his continued improvement.

In summary, I provided Mr. Towles with all of the necessary and appropriate treatment warranted based upon his condition and my

examinations. I did not deny him any necessary dental care. On each occasion Mr. Towles voiced a complaint related to his dental condition, he was evaluated by a member of the dental staff… .

Ex. 1 to the Defendants' Supplemental Special Report – Doc. No. 58-1 at 2-3 (citations to

medical/dental records and paragraph numbering omitted).

Finally, in an affidavit addressing Towles' allegation of perjury, Dr. Mendel

states:

I understand that Roland Towles ("Mr. Towles") charges that, in my affidavit dated June 18, 2015, I purposefully made false statements to the Court concerning my description of the extraction of his diseased molar as a "simple extraction." (Aff. of June 15, 2015, ¶ 8). This is absolutely incorrect. I never misled the Court or provided false information to the Court.

When I stated in my affidavit dated June 18, 2015, that my extraction of Mr. Towles' molar was a "simple" extraction, I was referring to the fact that I have performed many similar extractions of molars and cannot recall any specific instance when I referred a patient to an oral surgeon for such an extraction. In fact, dentists in free world clinics across Alabama routinely perform the same type of extraction that I performed with regard to Mr. Towles.

As noted in the dental treatment record I attached to my June 18, 2015 affidavit, and which I referenced in my affidavit of April 15, 2015, I did explain to Mr. Towles that the diseased molar was in a "particularly bad" or "difficult" area of his mouth and that extracting the molar would cause him a fair amount of discomfort. (*See* Aff. of Apr. 15, 2015, ¶ 7; Dental Trmt. Rec. (Feb. 2015) …, Ex. A to Aff. of June 18, 2015). It was a difficult extraction in the sense that it would cause a fair amount of discomfort to Mr. Towles because it involved an impacted molar. However, the extraction of Mr. Towles' molar was the type of tooth extraction that dentists routinely perform, rather than referring to an oral surgeon. It was a "simple" extraction because it was certainly one my training and experience qualified me to perform.

Mr. Towles also seems confused by the fact that, during the extraction of his molar, I made slight cuts into the bone surrounding his tooth. Specifically, I cut into the front (buccal) side and back (distal, or "D") side of the molar to create sufficient room for a grab-hold before extracting the tooth. (*See* Dental Trmt. Rec. (Feb. 2015)). Apart from

making slight cuts to create more space around Mr. Towles' tooth, I did not extract any portion of bone.

During tooth extractions, I routinely find it necessary to cut into the bone surrounding the tooth I am extracting in order to create sufficient room to extract the tooth. I do not recall a specific instance when I referred a patient to an off-site oral surgeon when it was necessary to do the slight cutting I performed during the extraction of Mr. Towles' molar. Dentists across Alabama perform such dental procedures during tooth extractions without referring patients to a dental specialist.

Again, to reiterate statements in my earlier affidavits, the fact that Mr. Towles apparently experienced "dry socket" after I extracted his tooth does not in any way suggest I should have referred him to an oral surgeon or other specialist for the extraction. Dry sockets are a common risk associated with dental extractions. In my professional opinion, Mr. Towles would have likely suffered from the same post-surgical condition regardless of whether the extraction was performed on-site at Bullock, at a free-world dental clinic or by a dental specialist.

As I stated in my earlier affidavits, I did not neglect Mr. Towles in any way when he voiced any dental complaints or any complaints concerning his teeth to me. I routinely evaluated and examined Mr. Towles and provided Mr. Towles with medication as I deemed appropriate in my judgment. I did not at any time ignore any request by Mr. Towles for dental treatment while he was under my care. I did not and have not deliberately ignored any dental complaints made by Mr. Towles or interfered in any way with the provision of dental care to Mr. Towles at any time. I have not taken any action which has caused Mr. Towles to experience any unnecessary pain and/or suffering. At all times during his incarceration at Bullock, I listened to Mr. Towles' complaints, undertook thorough dental examinations of him and provided directives and medication, when appropriate, to control the symptoms which he communicated to me. Based upon my various examinations of Mr. Towles, I can state to a reasonable degree of dental certainty that I and the other members of the dental staff at Bullock have provided Mr. Towles with all of the necessary dental attention, care and treatment which he required.

Defendants' Ex. 1 to the July 7, 2016 Response – Doc. No. 198-1 at 1-3 (citations to medical/dental records and paragraph numbering omitted).

Defendant Siddiq maintains that he and other members of the medical staff at Bullock provided treatment to Towles for each of his respective conditions in accordance with their professional judgment and further asserts that referral to free world physicians for treatment of the majority of his conditions was neither necessary nor warranted. In addressing Towles' initial claim challenging the medical treatment he received for knee pain, Dr. Siddiq provides the following information:

> Mr. Towles saw the nurse practitioner at Bullock on May 19, 2014, at which time he threatened to sue the medical staff at Bullock unless he received the medication Ultram. After making this threat, members of the ADOC security staff escorted Mr. Towles from the medical unit. Within days of this incident, Mr. Towles began voicing persistent complaints related to right knee pain. In a sick call request form dated June 3, 2014, Mr. Towles requested an evaluation of his right knee, which he complained was in pain. However, when Mr. Towles reported to sick call on June 4, 2014, he only voiced complaints of right shoulder pain and did not mention knee pain of any kind. Nevertheless, the sick call nurse still provided Mr. Towles additional ibuprofen and a topical muscle treatment for his shoulder.

> Mr. Towles submitted a sick call request form dated June 11, 2014, asking to see me regarding pain in his right knee. Upon receiving Mr. Towles' June 11, 2014, sick call request form, he was scheduled to be seen by me. The nurse practitioner at Bullock conducted an examination of Mr. Towles [when he reported to sick call] on June 12, 2014. At the time of the examination, Mr. Towles did not mention anything related to right knee [pain], but only requested a renewal of his existing pain medications as well as the renewal of a no-standing profile, which he received.

> Mr. Towles submitted another sick call request form on June 30, 2014 requesting an evaluation of his right knee as well as a handicap "profile." In the sick call request form, Mr. Towles also references running out of medications. The medical staff saw Mr. Towles during sick call on July 1, 2014. At the time of the sick call evaluation, Mr. Towles had run out of pain medication and was requesting a renewal of the pain medication and, as such, the medical staff referred him to a practitioner for renewal, which he subsequently received.

> In a sick call request form dated July 12, 2014, Mr. Towles continued to complain of pain in his right knee. The Bullock medical staff

evaluated Mr. Towles during sick call on July 13, 2014. At the time of this July [13], 2014, examination, Mr. Towles reported that Ultram improved his overall pain in his right shoulder and right knee. Mr. Towles was referred to a clinician and told to notify the medial staff if his condition should change. Between June and August of 2014, I along with the other clinicians at Bullock saw Mr. Towles on a least five different occasions regarding his complaints of knee discomfort and/or his persistent requests for pain medication.

In August of 2014, Mr. Towles continued to submit repeated sick call request forms related to his complaints of right knee pain. Mr. Towles submitted a sick call request form on August 22, 2014, requesting a cane or "something" for his knee, which he complained was "giving out" and further stated that he believed that his knee required "replacing." Mr. Towles failed to appear for sick call on August 22, 2014. The Bullock medical staff evaluated Mr. Towles the following day for complaints of right knee pain, at which time he was referred to the nurse practitioner for further evaluation. Upon examining Mr. Towles, the nurse practitioner decided to order an x-ray of his right knee on August 28, 2014, though Mr. Towles did not exhibit any signs or symptoms of injury, trauma or other defect. Mr. Towles underwent an x-ray of his right knee on August 29, 2014 which did not reveal any underlying condition or otherwise provide any evidence of any condition resulting in pain or discomfort.

I saw Mr. Towles on September 5, 2014 and evaluated him for his complaints of knee pain. At the time of the evaluation, it was not obvious that he was experiencing any particular type of injury or signs or symptoms of injury, and that his condition was likely the result of some type of arthritic condition. Therefore, I continued the prior orders for a non-steroidal anti-inflammatory for Mr. Towles.

In a sick call request form dated January 26, 2015, Mr. Towles complained about his right knee getting worse. The Bullock medical staff evaluated Mr. Towles on January 27, 2015, at which time he complained of pain in his right knee. He was evaluated during sick call and was referred to a clinician for further evaluation. The nurse practitioner at Bullock saw Mr. Towles on January 27, 2015 and evaluated him for his complaints of knee pain and for his request for renewed pain medications, which he received during the course of the evaluation. As with all of the prior examinations, this examination did not reveal any evidence that Mr. Towles was experiencing any actual medical problem with his knee resulting in pain or discomfort.

I next saw Mr. Towles on February 9, 2015, at which time he did not voice any complaints of any kind related to his right knee. Mr. Towles submitted a sick call request form dated February 22, 2015, in which he

requested to be seen "for my pain medication" and that he be seen by an orthopedic specialist [for evaluation of his knee and shoulder]. A registered nurse evaluated Mr. Towles on February 23, 2015, during sick call with respect to his complaints of right knee pain, but concluded that, given Mr. Towles' current pain medication regimen and the recent evaluations by the clinicians a Bullock, that Mr. Towles should continue his current pain management regimen.

Mr. Towles submitted a sick call request form dated March 5, 2015, asking for the renewal of his pain medications. The medical staff evaluated Mr. Towles on March 6, 2015, during sick call, at which time he requested a renewal of his pain medications for his right knee. After an evaluation of Mr. Towles' right knee, the medical staff referred Mr. Towles to me for renewal of his medications. I saw Mr. Towles that same day, at which time he continued to complain of discomfort in his knee and requested a renewal of his Ultram medication, which I provided him at the time. Again, my exam did not reveal any evidence of any specific condition or defect causing his complaints of pain and discomfort in his knee.

When the medical staff last saw Mr. Towles on March 13, 2015, he denied any problems of any kind and also refused to undergo an eye exam. As of the date of this affidavit [- April 14, 2015 -] Mr. Towles is receiving the medication Tramadol, also known as Ultram, for pain, which he receives three times per day. The orders included within Mr. Towles' medical records demonstrate that he consistently received pain medication for his complaints of right knee pain.

In addition to the pain medications prescribed for him, which he represented as a solution to his complaints of pain, Mr. Towles received bottom bunk profiles and no standing profiles which limited his physical activity.

Additionally, it is evident that Mr. Towles displays a certain level of paranoia related to his medical condition. Notably, he is currently receiving care by the mental health staff for paranoia. Nevertheless, the medical staff has attempted to continue to limit his anxiety and concerns about his condition. During a one year period ending August 29, 2014, the medical staff responded to Mr. Towles' repeated complaints of pain in various areas and extremities by ordering him to undergo a total of ten x-rays, i.e. almost one x-ray per month.

Based upon the medical care and treatment provided to Mr. Towles, I simply do not agree with the allegations included in his Complaint. With regard to Mr. Towles' specific allegations, I did not neglect him in any way when he voiced complaints regarding his knee pain. I routinely evaluated and examined Mr. Towles' knee and provided Mr. Towles with prescription medications when appropriate. I did not at any time ignore any request by

Mr. Towles for medical treatment while he was under my care. I did not and have not deliberately ignored any medical complaints made by Mr. Towles or interfered in any way with the provision of care to Mr. Towles at any time. I have not taken any action which has caused Mr. Towles to experience any unnecessary pain and/or suffering. At all times during his incarceration at Bullock, I listened to Mr. Towles' complaints, undertook thorough physical examinations of him and provided directives and medication when appropriate to control the symptoms which he communicated to me… .

Defendants' Ex. 3 to the Special Report – Doc. No. 20-3 at 2-6 (citations to medical records and paragraph numbering omitted). In a subsequent affidavit addressing additional claims presented by Towles, Dr. Siddiq avers:

I have received a variety of documents filed by Mr. Towles and reviewed them in an attempt to discern exactly what his complaints are in this case. However, many of his complaints I still cannot understand. From my reading of the documents, it appears that Mr. Towles is complaining about treatment for an alleged "separated shoulder."

Mr. Towles claims the medical staff delayed in providing him with medical attention for an alleged separated shoulder, including consultation with an orthopedic specialist. Specifically, Mr. Towles claims it was "weeks" after the medical staff received an x-ray report regarding his right shoulder before he saw a member of the medical staff. Unfortunately, Mr. Towles provides a less than accurate recitation of the events which transpired related to his complaints of shoulder pain. First, Mr. Towles underwent an evaluation on February 19, 2014, for complaints of shoulder pain, which resulted in an order for an x-ray of his shoulder. The shoulder x-ray only revealed a prior right shoulder separation, which the radiologist described as "mild." It is not uncommon to have a patient with an old injury like a shoulder separation, which may cause some level of discomfort, and the reason we continued Mr. Towles' pain management with Ultram. However, there is no indication of any malefaction, misalignment or other defect in his shoulder which would warrant an off-site consultation of any kind.

It appears to me that, in some ways, Mr. Towles, associates his "abdominal pain" with the shrapnel located in the connective tissue of his liver. For example, an abdominal CT conducted on July 15, 2013, at Bullock County Hospital found shrapnel in the "falciform ligament" which separates the left and right lobe of the liver. First, it is nearly impossible

that this foreign body would cause any level of pain given that it is lodged in the connective tissue of the liver and the liver itself has an extremely limited nerve system. In layman's terms, there is little, if any, sense of feeling in large portions of the liver.  Secondly, there is no indication that the foreign object in the connective tissue of the liver is impacting his liver or gastrointestinal function in any way. Therefore, in my professional opinion, the foreign body in the connective tissue of the liver does not warrant any further treatment or monitoring unless Mr. Towles' symptoms change in some way.

Between the spring and fall of 2013, I along with the other members of the medical staff, routinely saw Mr. Towles for complaints of abdominal discomfort. There is little question that Mr. Towles suffers from gastrointestinal reflux for which he has received medication.  However, on the occasion I have evaluated him for these complaints, I could not find any other medical explanation for his complaints of abdominal discomfort other than gastrointestinal reflux.  For example, I saw Mr. Towles on April 15, 2013, regarding his complaints of abdominal pain, but at the time, he denied any symptoms (i.e. fever, vomiting, loss of appetite, constipation) other than discomfort. Mr. Towles was also evaluated three times from mid-July through mid-August of 2013 regarding abdominal pain and voiced no complaints of constipation or loss of appetite. When I saw Mr. Towles on August 28, 2013, he specifically told me that "pain meds help." Again, I continue to believe that this is an issue of his reliance upon Ultram, which, as I informed Mr. Towles, can cause some gastrointestinal upset.

I addressed Mr. Towles' claim regarding alleged inadequate medical care for his knee at length in my first affidavit. Despite continuing to see Mr. Towles for his complaints of knee pain, nothing has changed with respect to my findings since the date of my first affidavit. Mr. Towles claims he underwent one or multiple prior surgical procedures regarding his right knee.  Mr. Towles' radiology report dated August 29, 2014, concludes "normal right knee," but Mr. Towles simply writes on the document submitted to the Court, "Osteo[sic] Arthritis in Knee." It remains unclear why he made this notation. Mr. Towles submitted a sick call request form dated April 2, 2015, complaining of knee pain and he was evaluated during sick call the very same day.  Mr. Towles submitted another sick call request form related to his knee on May 2, 2015 and was evaluated the next day during sick call. When I evaluated Mr. Towles on May 4, 2015, he complained of continuing knee pain, but only requested the renewal of his Ultram, which he reported did control his discomfort. I also provided him with a profile requiring his placement in a bottom bunk and no prolonged standing. As stated previously, I have not found any evidence or objective data providing me with any basis to order any further Diagnostic testing as

it relates to Mr. Towles' knee such as orthopedic consultation or further imaging studies.

Mr. Towles' new documents also mention some complaint about him expelling gas. Mr. Towles submitted a sick call form dated May 17, 2015, requesting to see me "about my gas problem." As indicated in the sick call request, [medical personnel] had evaluated Mr. Towles' complaint regarding gas a couple of weeks earlier… . [T]he exam [of Mr. Towles on May 17, 2015] did not reveal any condition, injury or trauma causing his gas discomfort, which was likely attributable to his diet. The allegations asserted by Mr. Towles regarding my conduct during the course of the examination and the statements that I made are entirely fabricated. Furthermore, I did not witness any member of the nursing staff laughing or engaging in any behavior which was directed at Mr. Towles.

In my opinion, this case is primarily about Mr. Towles' insistence upon remaining on pain medication. He admits in one document he filed that "the Ultram helped my pain [and] took the edge off… ." I remain concerned that the pain medication will become less effective over time if he continues to rely upon it too heavily. Therefore, Mr. Towles is currently receiving Ultram twice daily.

In addition to the foregoing, Mr. Towles raises a variety of other issues in passing related to the medical treatment he sought and received during his incarceration at Bullock which are, for all practical purposes unintelligible and Mr. Towles provides no facts or explanation as to his passing references to these various other conditions. For example, Mr. Towles complains of (a) an enlarged prostate; (b) a scarred left lung; (c) a cyst or polyp on his right sinus; (d) fluid in "left maxillary occipital lob[e] (in the Brain)"; and (e) MRSA infection resulting in a week long hospital stay. These allegations apparently arise solely from his reading of his medical records which he clearly does not understand. For example, an MRI study of Mr. Towles' brain on April 23, 2013 [performed at Jackson Hospital in Montgomery, Alabama], for general evaluation of an altered mental status, showed some fluid retention which the radiologist attributed to a prior injury. However, the presence of this fluid does not constitute anything requiring further medical attention and practically could not constitute the source of Mr. Towles' reported altered mental status.

As I stated in my original affidavit, I did not neglect Mr. Towles in any way when he voiced any medical complaints. I routinely evaluated and examined Mr. Towles and provided Mr. Towles with prescription medications when appropriate. I did not at any time ignore any request by Mr. Towles for medical treatment while he was under my care. I did not and have not deliberately ignored any medical complaints made by Mr. Towles or interfered in any way with the provision of medical care to Mr.

Towles at any time… . At all times during his incarceration at Bullock, I listened to Mr. Towles' complaints, undertook thorough physical examinations of him and provided directives and medication, when appropriate, to control the symptoms which he communicated to me. Based upon my various examinations of Mr. Towles, I continue to maintain that I, along with the other members of the medical staff at Bullock, have provided Mr. Towles with all of the necessary medical attention, care and treatment which he required.

Defendants' Ex. 2 to the Supplemental Special Report – Doc. No. 58-2 at 2-5 (citations to medical records and paragraph numbering omitted).

On August 20, 2015, Dr. Siddiq filed a supplemental affidavit in which he provides additional information regarding Towles' claims alleging denial of treatment and/or refusal of referrals to free-world specialists for treatment of his hypothyroidism, deep vein thrombosis, trauma to his frontal lobes, an enlarged prostate, a dislocated wrist, the presence of a metallic object in his liver, the diet provided to him after dental surgery, a scarred left lung, a cyst/polyp in his sinus cavity, and an MRSA infection. In this affidavit, Dr. Siddiq states that:

At the outset, I must state that I have conducted a review of Mr. Towles' medical records and cannot identify any medical or factual basis for his claims. The issues raised by Mr. Towles which are addressed in this Affidavit are issues which are largely non-issues. I cannot identify any medical basis to conclude that I or the other members of the medical staff at Bullock failed or refused to provide Mr. Towles with any medical treatment. On each occasion that Mr. Towles submitted a sick call request form, we responded with a sick call evaluation, Diagnostic testing (if warranted), imaging testing (if indicated) and multiple follow-up examinations and appointments in many instances. While I understand that Mr. Towles has filed a lawsuit and made certain allegations related to the actions of the medical staff at Bullock, I would not withhold care or provide anything less than fully adequate medical care to Mr. Towles during his incarceration at Bullock Correctional Facility.

The Master Problem List set forth in each inmate's medical records, including Mr. Towles' medical records, generally identifies the medical and/or mental health diagnoses received by an inmate during the course of their incarceration within the ADOC system. As it relates to Mr. Towles, he raised a wide variety of alleged issues and/or medical conditions for which he is seeking some form of additional treatment and/or off-site referral; however, only two of those conditions appear in his problem list. As indicated on his Master Problem List, Mr. Towles indicated some diagnosis with hyperthyroidism on April 17, 2013.

Also, as indicated in the Medical Coding Assessment Guides included within Mr. Towles' medical records, the various individuals who have evaluated Mr. Towles have always concluded that he is a "generally healthy" individual, excluding the short period of time when he was on a medical hold due to []pendency of off-site referrals and pending medical testing.

Additionally, Mr. Towles received a diagnosis of an MRSA infection on April 22, 2013. MSRA stands for "methicillin-resistant staphylococcus aureus."

In the paragraphs that follow, I will address each of the issues raised by Mr. Towles separately.

Hypothyroidism … : Mr. Towles apparently makes the allegation related to hypothyroidism entirely based upon his reading of certain documents from his April, 2013 admission to Jackson Hospital in Montgomery.  It is not based upon any actual medical test, any lab report or any documented medical opinion offered by any physician.

Hypothyroidism is a known medical condition caused by an insufficient production of hormones by the thyroid gland.  While the condition usually appears in older women, it is also possible in men and is typically associated with symptoms of fatigue, weight gain, low blood pressure, decreased respirations, and decreased temperature. Hypothyroidism is not necessarily life threatening, though it can in very rare instances develop into a condition known as myxedema which can be life threatening.  Hypothyroidism is usually diagnosed through a series of blood tests. It is treated typically through the use of synthetic thyroid hormones which restore the adequate hormone levels within the body.

It is indisputable that Mr. Towles indicated to medical personnel at Jackson Hospital in April of 2013 that he had previously been diagnosed with hypothyroidism. We have not received any documentation to support such a conclusion. In fact, the medical staff at Jackson Hospital only noted that they would check his particular labs for evidence of hypothyroidism and resume medications for this condition after checking his lab results. Moreover, the medical staff at Bullock does not currently possess

documentation that confirms a diagnosis of hypothyroidism. When the Bullock medical staff initially believed that Mr. Towles' representation of a prior diagnosis was confirmed at Jackson Hospital, it provided him with the appropriate medication - Synthroid. However, it is now evident that there is no medical evidence of any kind that Mr. Towles has hypothyroidism and, as such, we cannot treat a condition which Mr. Towles does not have. Stated differently, Mr. Towles does not require any further medical treatment for hypothyroidism or a referral to an off-site specialist because he does not suffer from hypothyroidism.

<u>Deep Vein Thrombosis</u> …: Like Mr. Towles' allegation that he suffers from hypothyroidism, he also claims he suffers from deep vein thrombosis based upon a non-specific note from the April, 2013 notations from Jackson Hospital. However, this note appears to be more intended to treat any potential leg clots (in laymen's terms) which Mr. Towles might develop during his hospital stay in April of 2013. In very basi[c] terms, certain individuals (including individuals [on] certain medications) who lie in bed for extended periods of time are at risk for developing blood clots and/or circulatory issues in their legs and feet. For that reason, hospital patients often receive compression hose. I have read the notation in the Jackson Hospital records, which indicates to me an instruction to the medical staff to monitor Mr. Towles for this condition during his hospitalization. Based upon my review of his medical records, his medical history and my multiple exams of him, I have not seen any evidence of any kind that he has ever suffered from or is currently suffering from deep vein thrombosis.

<u>"Trauma to Frontal Lobes"</u> …: While hospitalized at Jackson Hospital in April of 2013, Mr. Towles underwent an MRI of his brain with and without contrast due to his altered mental status. The radiologist recorded certain findings from the MRI which are included in a MRI report, which is the apparent basis for Mr. Towles' allegations related to the issues with "trauma to frontal lobes." The specific finding included in the MRI results from the MRI of Mr. Towles' brain includes the following sentence:

"[t]here is encephalomalacia that may be related to previous trauma or infraction that involves both frontal lobes."

In the impression section of this MRI report, the radiologist further states that the encephalomalacia is "minimal" in the right occipital lobe.

Encephalomalacia as it relates to the frontal lobes is generally known as the softening of brain tissue as a result of a prior head injury of some kind. However, many individuals with encephalomalacia of the frontal lobes do not display any signs of trauma, dysfunction or mental logical deficit.  In this particular instance, the MRI of Mr. Towles' brain on April 23, 2013, simply confirmed a prior injury. It did not serve to confirm

or indicate any existing condition. Moreover, Mr. Towles has not reported any signs or symptoms which would indicate to me that these findings were related to any injury he sustained during his incarceration at Bullock or his incarceration in the ADOC custody. Based upon all of my interactions with Mr. Towles, it has been evident to me that Mr. Towles, despite having some mental health related issues which are being addressed by the mental health staff at Bullock, does not have any symptoms or display any evidence of any significant neurological deficit that would be related to a recent brain injury or encephalomalacia that he experiences as a result of some prior head trauma. Therefore, in the absence of any objective medical evidence that Mr. Towles is suffering from any symptoms or any particular maladies related to some sort of prior brain injury, I could not justify referring him to an off-site specialist. In short, there is no evidence of any kind based upon my numerous interactions with Mr. Towles that he is suffering from any condition which would in any way be related to any trauma or abnormalities with the frontal lobes of his brain. As such, no further treatment (including an off-site specialty referral is warranted).

An "enlarged prostate" …: I have attempted to determine exactly how Mr. Towles reached his conclusion that he is experiencing an enlarged prostate. This conclusion is without any support in his medical records. He has not submitted any sick call request forms complaining of (a) an enlarged prostate, or (b) any of the symptoms typically associated with an enlarged prostate. …. As the Court can see from Mr. Towles' voluminous sick call requests, he has voiced a wide variety of complaints, but persistent complaints of difficulty urinating are totally lacking. Again, there is no evidence that Mr. Towles suffers from an enlarged prostate and, therefore, I cannot provide any further treatment or off-site referral for a medical condition for which he does not display any symptoms and, for which, he has not tested positive.

"[D]islocated right wrist which remains misaligned with a protruding bone" … : The medical staff [at Bullock] received a sick call request form dated December 9, 2013 in which Mr. Towles first reported falling in the shower and claiming that a bone in his wrist was "sticking up." Mr. Towles appeared for evaluation during the chronic care clinic held on December 9, 2013. At the time of the December 9, 2013, chronic care appointment, Mr. Towles reported falling approximately two days prior to the evaluation when he jumped off his bunk. Mr. Towles reported to the member of [the] medical staff conducting chronic care clinics at that time that there was a bone sticking out of his hand that he had another inmate pull which caused the bone to go down. Prior to December 9, 2013, there is no record in Mr. Towles' medical records of him having any injury to his

right wrist. The nurse practitioner entered orders for Mr. Towles to undergo an x-ray of his right wrist on December 9, 2013.

Mr. Towles underwent an x-ray of his ... right wrist on December 9, 2013 -- i.e. the same day as the order for the x-ray of his right wrist. As indicated in the radiology report from the wrist x-ray, the x-ray was "**Grossly unremarkable** ...." The x-ray of Mr. Towles' right hand taken at the same time did reveal some prior injury to his right hand, which appeared to be pre-existing and was not the result of any recent injury or any trauma which could be surgically repaired.

Mr. Towles submitted a sick call request form dated December 16, 2013 in which he complained of pain and swelling in his right wrist. Mr. Towles was evaluated for right wrist pain on December 17, 2013 by a member of the nursing staff. At that time, Mr. Towles specifically stated to the nursing staff that his wrist was not "hurting," and he requested some sort of "wrist bracelet." Following this sick call evaluation, Mr. Towles was referred to a practitioner for further evaluation.

The nurse practitioner at Bullock examined Mr. Towles again on December 23, 2013, at which time he continued to complain of a limited range of motion in his right wrist. Upon examination, the nurse practitioner did not notice any obvious signs of fracture or trauma and, therefore, ordered a [splint] for him and ordered him to undergo x-rays. The nurse practitioner also ensured that Mr. Towles received a dosage of pain medication sufficient to control his right wrist discomfort.

Mr. Towles returned for a follow up appointment with the medical staff on January 13, 2014, at which time he continued to complain of right wrist pain and a limited range of motion. During the course of this appointment, the nurse practitioner read the radiology report to Mr. Towles. The nurse practitioner also offered Mr. Towles to continue to rely upon the splint that had been provided to him and instructed him to notify the medical staff if his symptoms should change in any way.

When Mr. Towles submitted a sick call request form dated [for] January 25, 2015, he did not mention anything related to his right wrist. Mr. Towles submitted a sick call request form dated January 29, 2015, complaining about an infection in his jaw and the need for additional glasses as well as some problem with his "thumb." The sick call request form indicates that Mr. Towles is indicating a problem with his left thumb. However, the January 29, 2015, sick call request form mentions nothing about a wrist problem. When Mr. Towles appeared for evaluations by the nurse practitioner on February 5, 2014, and February 19, 2014, he did not mention any complaints of any kind related to his right wrist.

In sum, Mr. Towles' right wrist is not dislocated. He has not sought or required medical treatment for his right wrist between the winter of 2014

and the filing of this action. He requires no orthopedic consultation and his claim in [t]his regard is without any medical support. The x-ray of his right wrist on December 9, 2015, directly disproves his allegations in this regard.

Referral to "free-world surgeon for removal of the metallic object from his liver"… : It appears to me that, in some ways, Mr. Towles associates his "abdominal pain" with the foreign body located in the connective tissue of his liver. For example, an abdominal CT conducted on July 15, 2013, at Bullock County Hospital found shrapnel in the "falciform ligament" which separates the left and right lobe of the liver. First, it is nearly impossible that this foreign body would cause any level of pain given that it is lodged in the connective tissue of the liver and the liver itself has an extremely limited nerve system. In layman's terms, there is little, if any, sense of feeling in large portions of the liver. Secondly, there is no indication that the foreign object in the connective tissue of the liver is impacting his liver or gastrointestinal function in any way. Therefore, in my professional opinion, the foreign body in [] the connective tissue of the liver does not warrant any further treatment or monitoring unless Mr. Towles' symptoms change in some way.

In Doc. 61, filed on June 19, 2015, Mr. Towles goes as far as claiming that the medical staff has "ignored" the metallic object in his abdomen. This is simply untrue.

Mr. Towles appeared for sick call evaluation[s] on April 12 and April 13, 2013, at which time he complained of right upper right quadrant pain and received an evaluation by a member of the medical staff and a referral for further evaluation by the medical staff. Shortly thereafter, he was hospitalized as referenced above. During his April, 2013, hospital stay at Jackson Hospital, the Jackson Hospital staff ordered an abdominal x-ray which revealed a "metallic pellet like structure in the right upper quadrant." However, his complaints were fairly infrequent and non-specific and the sheer presence of a foreign body (as mentioned above) did not warrant immediate investigation or further treatment. Nevertheless, between April and May, 2013, we continued to monitor his condition and other medical conditions.

An ultrasound of Mr. Towles' abdomen conducted on June 13, 2013 was normal in all respects. On June 17, 2013, Mr. Towles was evaluated for complaints of upper quadrant pain which he claimed [was] associated with some foreign object lodged in his abdomen. As noted by the medical staff conducting an evaluation on June 17, 2013, Mr. Towles had undergone an ultrasound four days prior to June 17, 2013 and the medical staff continued to provide him with pain medication to control his complaints of discomfort. The medical staff saw Mr. Towles again on June 27, 2013 at which time he continued to complain of upper quadrant pain

and requested a more significant medication to treat his pain. At the conclusion of this appointment, Mr. Towles received additional pain medications. I and other clinicians continued to follow up with Mr. Towles through July of 2013 while he continued to complain of upper quadrant pain which resulted in a referral to an off-site gastroenterologist for further evaluation.

Mr. Towles underwent a CT of his abdomen on July 16, 2013, which simply confirmed the presence of a metallic foreign body "within the falciform ligament consistent with a prior gunshot injury." The radiologist report from the CT scan specifically states that there was no "abscess or other abnormality identified around this bullet."

As a result of his continuing complaints and after receiving the CT report, I referred Mr. Towles to an off-site gastroenterologist. This off-site gastroenterologist evaluated Mr. Towles on July 23, 2013 at which time he recommended a colonoscopy and a further investigation of Mr. Towles' gastrointestinal tract with an imaging study known as an EGD. An EGD is technically known as an esophagogastroduodenoscopy, which is simply a test to examine the lining of the esophagus, stomach and the initial portion of the small intestine.

As indicated in Mr. Towles' medical records, he met with a member of the medical staff after undergoing the colonoscopy and EGD at which time he was informed that there were no findings of any abnormalities as a result of these studies except for the presence of the foreign body. Despite the absence of any objective medical data supporting Mr. Towles' claim of continuing pain as a result of a metallic object in his body, the medical staff continued to provide him with pain medication even as of August 28, 2013, following his normal colonoscopy and EGD. In sum, there is no evidence of any abscess, infection or other problem associated with the foreign body lodged in Mr. Towles' abdomen. If further treatment was warranted with an off-site specialist, it would have been ordered by the gastroenterologist who saw Mr. Towles in July of 2013. In this instance, Mr. Towles received exactly what he is requesting -- an off-site consultation which concluded that no further care was warranted.

Denial of a "proper diet since his dental surgery" … :  Mr. Towles is fairly specific in his complaints that "medical doesn't care" as it relates to his alleged difficulties eating and "staying hungry." (Doc. No. 37 at pg. 3). Mr. Towles specifically alleges that the issues pertaining to his diet following his extraction of his tooth constitutes a denial of "proper medical treatment." (Doc. No. 37 at pg. 3). Mr. Towles raised these exact same allegations in Doc. No. 85, filed on July 9, 2015. However, he now acknowledges that he "can now chew some of the food" though he still

experiences some degree of pain associated with his gums. (Doc. No. 85 at p. 1).

One of the problems [with the plaintiff's allegations] relates to his inconsistent descriptions… . For example, Mr. Towles, despite insisting that he was entitled to a "mechanical soft diet," submitted a sick call request form around March 9, 2015, at which time he wrote, "I can't even eat the mechanical soft diet." Therefore, it goes without saying, that plaintiff could not have known of his inability to eat "the mechanical soft diet," unless he was in fact receiving the mechanical soft diet as prescribed.

The history of the attention provided to Mr. Towles regarding his requests for a diet is clear. On January 12, 2015, the nurse practitioner saw Mr. Towles for complaints of lower left jaw pain at which time he received a referral to the dentist, an antibiotic as well as continuing pain medications for his discomfort. On February 7, 2015, Mr. Towles submitted a sick call request form requesting to see me relating to his "special diet change," and his complaints that he was still hungry following the "change" of his diet by the medical staff. Mr. Towles specifically acknowledged receiving a "special diet" in a sick call request form dated February 8, 2015. In his sick call request form, Mr. Towles wrote, "I need to be seen … about my special diet that i[']m on now."

There is no question that orders were entered by the medical staff to ensure that Mr. Towles received a mechanical soft diet. In an order dated March 10, 2015, the nurse practitioner specifically noted her order for Mr. Towles to receive a "bland/mechanical soft diet [times] 30 days." Three days later, the nurse practitioner entered a separate order in which she amended her prior order directing the kitchen steward to ensure that Mr. Towles received a supplemental sandwich in addition to his mechanical soft diet for a period of thirty days.

More importantly, Mr. Towles' recent complaints have subsided and changed. When Mr. Towles requested to see the dentist for complaints of continuing tenderness around his mouth in April of 2015, he did not mention any requests for any type of special diet. On May 13, 2015 I saw Mr. Towles related to several complaints including his complaints related to continuing dental pain. In response to those complaints, I wrote specific orders for Mr. Towles to receive a mechanical soft diet and I then instructed Mr. Towles to follow up with Dr. Mendel as needed. Mr. Towles submitted a sick call request form on May 16, 2015, indicating that a nurse wrote an order for Mr. Towles to receive three sandwiches at night because of difficulty eating. As recently as August 3, 2015, Mr. Towles submitted a sick call request form once again discussing his mechanically soft diet. In his sick call request form, Mr. Towles wrote, "I need to see [Doctor] … to get my diet changed from mechanical soft 2100 to wellness diet. [M]y

mouth is better from dental. I can chew now [some]." In short, there is no evidence that I or any other member of the medical staff ever refused to provide Mr. Towles with a mechanical soft diet, as requested. In fact, the medical records and Mr. Towles' handwritten statements in his records confirm that he requested and received orders [for] a special diet [and extra food at night].

"[S]carred left lung" …: This allegation raised by Mr. Towles also arises from his misunderstanding of an imaging study conducted in April of 2013. Again, the chest x-ray in question merely states that he has some "minimal scarring" in his lower left lung and, most importantly, it was "unchanged" from the prior study utilized by the radiologist. First, there is no medical protocol or treatment regimen for "mild scarring" of a lung. In simple terms, scars are healed wounds and there is no evidence of any further scarring which is causing any respiratory issue. Again, Mr. Towles raises a myriad of complaints but none related to respiratory function and, as such, there is no objective medical data to conclude that he is suffering from any medical condition associated with this finding which warrants any further medical treatment or attention of any kind.

"[C]yst/polyp in his right sinus" …: The April 23, 2013, MRI report from the MRI of Mr. Towles' brain taken at Jackson Hospital also indicates some issues with regard to his left maxillary sinus. In particular, the radiologist noted the presence of a possible mucus retention cyst or polyp in the right maxillary sinus. With regard to the left maxillary sinus, the radiologist simply noted the presence of some mucus or fluid. The findings are not unusual. In particular, the presence of a mucus retention cyst or polyp is not unusual. Patients typically do not require surgery with regard to these conditions as they are surgically treated only in instances where there are certain signs of symptoms, including, but not limited to, chronic sinus infections. As indicated throughout Mr. Towles' medical records, which I reviewed in preparing this affidavit, Mr. Towles has not indicated the degree or type of history necessary to warrant surgical treatment of a condition which is not causing any type of sinus issues with him. Moreover, as indicated through the sick call request forms filed by Mr. Towles throughout his incarceration, he has not complained at any time of any signs or symptoms which would in any way be related to the presence of a mucus retention cyst or polyp in his sinuses.

Once again, Mr. Towles' allegations related to his sinuses and/or the presence of an alleged cyst or polyp in his right sinuses is nothing more than a misreading of a radiology report. In this particular instance, the radiologist noted findings which are not unusual for any MRI of an individual['s] head or brain. For example, if an individual had a common cold, these findings would be entirely normal or expected. In short, Mr.

Towles has not submitted any sick call request forms complaining of any symptoms of any kinds which would warrant a treatment for sinus drainage as noted in this MRI. Moreover, there is no evidence of any kind to support that any mucus retention cyst or polyp in his right maxillary sinus is causing him any complications of any kind or warrants any further treatment of any kind. It is important to also note, this MRI of Mr. Towles' brain was done over two years ago and, since that time, Mr. Towles has not complained of any signs of symptoms that would be in any way related to these conditions. Therefore, I cannot identify any medical justification for (a) providing any further treatment of any kind to Mr. Towles for sinus congestion that was present on April, 2013 (more than two years ago), or (b) a mucus retention cyst or polyp which has not caused any symptoms or difficulties of any kind with respect to Mr. Towles over the last two and a half years.

"MRSA infection" …: Mr. Towles allegations related to a prior MRSA infection clearly related to a prior infection. I have reviewed his recent examinations and my notes from those examinations and cannot identify any signs or symptoms or complaints that indicate or suggest in any way that he is currently experiencing any type of MRSA infection. The medical records further document that these prior infections were treated entirely appropriately with dressing changes and antibiotics. Sending Mr. Towles to a specialist for MRSA at this stage would be akin to sending a patient to a specialist for an episode of the flu that the patient experienced several months ago and for which he or she no longer suffers any symptoms. In sum, there is no basis for his claim that he should have received any different treatment ([from that provided] which obviously resolved his infection).

As stated previously, it is evident that Mr. Towles displays a certain level of paranoia related to his medical condition. Notably, he is currently receiving care by the mental health staff for paranoia. Nevertheless, the medical staff has attempted to continue to limit his anxiety and concerns about his condition. During a one year period ending August 29, 2014, the medical staff responded to Mr. Towles' repeated complaints of pain in various areas and extremities by ordering him to undergo a total of ten x-rays, i.e. almost one x-ray per month.

Based upon the medical care and treatment provided to Mr. Towles, I simply do not agree with the allegations included in his Complaint. With regard to Mr. Towles' specific allegations, I did not neglect him in any way when he voiced complaints regarding his knee pain. I routinely evaluated and examined Mr. Towles' knee and provided Mr. Towles with prescription medications when appropriate. I did not at any time ignore any request by Mr. Towles for medical treatment while he was under my care. I did not

and have not deliberately ignored any medical complaints made by Mr. Towles or interfered in any way with the provision of medical care to Mr. Towles at any time. I have not taken any action which has caused Mr. Towles to experience any unnecessary pain and/or suffering. At all times during his incarceration at Bullock, I listened to Mr. Towles' complaints, undertook thorough physical examinations of him and provided directives and medication, when appropriate, to control the symptoms which he communicated to me. Based upon my various examinations of Mr. Towles, I can state to a reasonable degree of medical certainty that I and the members of the medical staff at Bullock have provided Mr. Towles with all of the necessary medical attention, care and treatment which he required.

Defendants' Ex. 1 to the Fourth Supplemental Special Report – Doc. No. 115-1 at 2-16.

(citations to medical records and paragraph numbering omitted) (emphasis in original).

Dr. Siddiq filed a fourth affidavit on September 10, 2015 as a supplement to his prior affidavits in which he addresses the claims presented by Towles regarding the medical treatment provided on July 22, 2015. In this affidavit, Dr. Siddiq states that:

The medical staff received [a] sick call request form from Mr. Towles on the afternoon of July 21, 2015 [seeking an appointment with the facility's physician regarding various complaints, including pain in his right knee and shoulder, jock itch, itchy spots and dandruff]. Mr. Towles then reported to sick call on July 22, 2015, where he was initially screened by a member of the nursing staff and then referred to me for evaluation.

I saw Mr. Towles on July 22, 2015, in response to his July 21, 2015, sick call request form. As indicated in my notes from this interaction, Mr. Towles first requested muscle rub, which he believed was needed for his "swollen knee." However, I closely examined Mr. Towles' knee for swelling, comparing his right knee to his left to see any noticeable signs of swelling or fluid buildup. I also applied light pressure to test for any swelling. Based upon my examination, there were no visible signs of swelling or trauma to Mr. Towles' right knee.

July 22, 2015, was not the first occasion that we (members of the Bullock medical staff) saw Mr. Towles for knee pain. Mr. Towles' complaints of knee pain originate as early as June of 2014, more than a year prior. In the months that followed (i.e. between June and August of 2014), we saw Mr. Towles on at least five (5) different occasions for complaints of knee pain. Throughout this period of time, examinations of Mr. Towles'

right knee (like the examination conducted on July 22, 2015), did not reveal any injury, deformity, defect, swelling, misalignment, malformation, dysfunction or any other treatable medical condition. In August of 2014, the nurse practitioner at Bullock even ordered an x-ray of Mr. Towles' right knee which did not reveal any underlying condition mandating any type of further treatment. Despite the numerous examinations of Mr. Towles' right knee prior to July of 2015, we could not identify any treatable medical condition with respect to his knee. So, when Mr. Towles appeared in July of 2015, without any meaningful change in his condition, my conclusion did not change. I could not identify any signs or symptoms on July 22, 2015, to otherwise alter my conclusion that Mr. Towles was not suffering from any treatable condition as it related to his right knee.

The allegations by Mr. Towles regarding my interaction with him on July 22, 2015 are simply not true. I never told Mr. Towles that I would not treat him or that I would not "do anything" for his right knee. I did not raise my voice, yell or scream at Mr. Towles. I did not refuse to listen to Mr. Towles during this appointment. I did not ask any ADOC officer to remove Mr. Towles from the examination room or the health care unit. I did not discontinue any orders of any kind and I did not withdraw any prior orders. I did not terminate any profiles issued to Mr. Towles. In fact, in my interactions with Mr. Towles, I have never engaged in such conduct.

Mr. Towles assigns some level of significance to the fact that the nursing staff referred him to me, but this referral is standard for any type of orthopedic type complaint. The fact that the nursing staff referred Mr. Towles to me does not indicate any conclusion by the nursing staff that Mr. Towles suffered from any condition of any kind. In the case of Mr. Towles, he was referred to me because he was complaining of knee pain and the nursing protocols do not permit the nursing staff to address the type of complaints made by him at that time.

At the conclusion of the appointment on July 22, 2015, I instructed Mr. Towles to notify the medical staff if his condition changed in any way. My response to Mr. Towles' complaints on July 22, 2015, was consistent with the decisions made over the course of the prior year. My conclusion at that time was based exclusively upon my examination of Mr. Towles and my medical judgment. My conclusion that he was not suffering from any treatable medical condition was not the result of this lawsuit or anything related to this lawsuit.

As I have stated previously, I have not ignored Mr. Towles' complaints or refused to provide any form of necessary medical treatment to Mr. Towles. However, I can only provide treatment for conditions for which Mr. Towles manifests some symptoms. With respect to his right knee, Mr. Towles showed no treatable symptoms… . I have not and will not

retaliate against Mr. Towles or make any decision in treating Mr. Towles as
my patient based upon the existence of this lawsuit.

Defendants' Ex. 1 to the Fifth Supplemental Special Report – Doc. No. 125-1 at 2-5
(citations to medical records and paragraph numbering omitted). Additionally, despite
Towles' allegations that Nurse McNeil and Officer Salter witnessed Dr. Siddiq act in an
unprofessional manner during the July 22, 2015 evaluation, these individuals deny they
observed any such action. Defendants' Ex. 2 to the Fifth Supplemental Special Report –
Doc. No. 125-2 at 3; Defendants' Ex. 3 to the Fifth Supplemental Special Report – Doc.
No. 125-3 at 2.

In his final affidavit, Dr. Siddiq addresses Towles' allegation of perjury as
follows:

> I understand that Roland Towles ("Mr. Towles") charges that I
> purposefully made false statements to the Court concerning his prostate,
> including in my affidavit dated August 20, 2015. This is entirely incorrect.
> At no time did I intend to mislead the Court or provide false information to
> the Court.
>
> As I previously stated in my August 20, 2015 affidavit, in August of
> 2015 Mr. Towles was asymptomatic for an enlarged prostrate. (Aff. of Aug.
> 20, 2015, ¶ 14). Prior to August 20, 2015, Mr. Towles did not complain to
> me about suffering from any symptoms typically associated with an
> enlarged prostate. Symptoms of an enlarged prostate may include a weak
> or slow urine stream, a feeling of incompletely emptying the bladder during
> urination, difficulty beginning urination, frequent urination, straining to
> urinate and a fitful urine stream. Prior to August 20, 2015, Mr. Towles did
> not submit sick call requests complaining about any persistent symptoms
> typically associated with an enlarged prostate. Nothing in Mr. Towles'
> medical records, his statements to me or my personal examinations of him
> led me to conclude that he was suffering the symptoms of an enlarged
> prostrate in August of 2015.
>
> The fact that a CT scan of Mr. Towles' abdomen on July 16, 2013,
> did indicate that his prostrate was "slightly enlarged," (CT Scan (July 16,
> 2013), Ex. A to Aff. of June 18, 2015), does not contradict my conclusion.

As of July 16, 2013, Mr. Towles was forty-six (46) years old. Based on my experience as a medical doctor in treating hundreds, if not thousands, of male patients, it is very common for men at that age to have an enlarged prostate without experiencing any of the signs or symptoms of an enlarged prostate. Despite the "slightly enlarged" state of Mr. Towles' prostate in July of 2013, Mr. Towles did not report any symptoms to me suggesting, nor did I observe any indications that, the condition of his prostate in August of 2015 required medical treatment beyond "watchful waiting," i.e., monitoring the condition of the prostate to determine whether medications or more aggressive treatment might be indicated. Instead, a "slightly enlarged" prostate is not unusual for some of his age.

Obviously I did not intend to mislead the Court about the July 16, 2013 CT scan, because I explicitly referenced the CT scan in my affidavit dated August 20,2015, and attached a copy of the CT scan to an earlier affidavit. (See Aff. of Aug. 20, 2015, 26; CT Scan (July 16, 2013), Ex. A to Aff. of June 18, 2015). The CT scan is simply irrelevant to whether Mr. Towles was or was not exhibiting or suffering from the ***symptoms*** of an enlarged prostate in ***August of 2015***. He was not. As the CT scan itself and other medical records from July of 2013 and earlier demonstrate, (see medical record (July 2013- Sept. 2013), Ex. A to Aff. of June 18, 2015; Progress Note July 2013 - Aug. 2013), Ex. A to Aff. of June 18, 2015; Inter Discipl. Progress Notes (Apr. 15, 2013), Ex. A to Aff. of June 18, 2015; CT Scan (July 16, 2013), Ex. A to Aff. of June  18, 2015),  I ordered  the CT scan because he had been complaining of discomfort in the right upper quadrant of his abdomen, not because he was expressing concerns about frequent urination or other symptoms of an enlarged prostate.

As I stated in my earlier affidavits, I did not neglect Mr. Towles in any way when he voiced any medical complaints. I routinely evaluated and examined Mr. Towles and provided Mr. Towles with medication as I deemed appropriate in my judgment. I did not at any time ignore any request by Mr. Towles for medical treatment while he was under my care.  I did not and have not deliberately ignored any medical complaints made by Mr. Towles or interfered in any way with the provision of medical care to Mr. Towles at any time.  I have not taken any action which has caused Mr. Towles to experience any unnecessary pain and/or suffering. At all times during his incarceration at Bullock, I listened to Mr. Towles' complaints, undertook thorough physical examinations of him and provided directives and medication, when appropriate, to control the symptoms which he communicated to me. Based upon my various examinations of Mr. Towles, I can state to a reasonable degree of medical certainty that I and the other members of the medical staff at Bullock have provided Mr. Towles with all of the necessary medical attention, care and treatment which he required.

Defendants' Ex. 2 to the July 7, 2016 Response – Doc. No. 198-2 at 2-4 (emphasis in original) (paragraph numbering and citations to medical records omitted).

In response to Towles' claims, defendant Duffell states she is "not a nurse or a physician and was not involved in any decision related to Mr. Towles' medical care during his incarceration at Bullock. Because I am not a nurse or physician, I am not involved in the provision of medical care or attention to the inmate population at Bullock my duties and responsibilities are solely administrative in nature." Defendants' Ex. 1 to the Special Report – Doc. No. 20-1 at 6. In a subsequent affidavit addressing a claim by Towles that she interfered with his medical treatment, Ms. Duffell explains as follows:

> … I am not the "head of medical" and do not "oversee every issue of medical treatment." As stated in my original affidavit, I am not licensed as a nurse or a physician. My role at Bullock with respect to the operations of the medical unit [is] entirely administrative in nature. Therefore, I am not authorized to make any decision of any kind as to timing, the extent or the nature of medical treatment received by any inmate. Likewise, I am not qualified to "oversee every issue of medical treatment." The medical treatment afforded the inmates at Bullock, such as Mr. Towles, [is] directed [and provided] entirely by the clinical staff. As it relates to Mr. Towles, I am not familiar with any of his medical conditions or the available treatment options for any medical condition that the Bullock medical staff may have diagnosed.
> While it is difficult for me to identify exactly how Mr. Towles claims that I allegedly interfered with his medical treatment, the allegation is simply false. I never interfered with any medical treatment sought or received by Mr. Towles… .

Defendants' Ex. 3 to the Supplemental Special Report – Doc. No. 58-3 at 2.

After a thorough and exhaustive review of record in this case, the court concludes that the course of treatment undertaken by the defendants did not violate Towles'

constitutional rights. Specifically, there is no evidence upon which the court could conclude that Dr. Mendel or Dr. Siddiq provided treatment to Towles in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505. Rather, the evidence before the court demonstrates that medical personnel, including the nursing staff, Dr. Mendel and Dr. Siddiq, examined Towles for his complaints regarding his wisdom tooth and numerous medical issues, prescribed medication to Towles in an effort to treat his conditions, and ordered diagnostic and imaging tests to aid in determining the appropriate course of treatment for Towles. Whether Dr. Mendel or Dr. Siddiq "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (citing *Estelle*, 429 U.S. at 107). In addition, to the extent that Towles complains that the defendants should have pursued modes of treatment other than that prescribed, this allegation does not rise to the level of deliberate indifference. *See Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment does not constitute deliberate indifference which violates the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

As a result, the court concludes that the alleged lack of medical treatment did not constitute deliberate indifference. "Although [Towles] attempts to overcome summary

judgment by offering his own sworn statement[s] and [those] of [other inmates] to support his allegations, the contemporaneous medical records and opinions of the examining medical doctor[] [and dentist] show that this purported evidence is baseless." *Whitehead*, 403 F. App'x 401, 403 (11th Cir. 2010). Thus, the conclusory statements submitted by Towles alleging a lack of due care and deliberate indifference do not create a dispute of fact in the face of the contradictory, contemporaneously created medical records. *Id.*; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) (same). In addition, Towles has failed to present any evidence showing that the manner in which Dr. Mendel, Dr. Siddiq and the medical staff at Bullock addressed his conditions created a substantial risk to his health that the defendants consciously disregarded. The record is therefore devoid of evidence showing that the defendants or any other medical professional acted with deliberate indifference to a serious medical need experienced by Towles. Consequently, summary judgment is due to be granted in favor of defendants on the deliberate indifference claim.

## B. Retaliation

Towles alleges that in June of 2014 Dr. Siddiq reduced the length of his prescription for chronic pain medication and subsequently refused to renew his pain medication in retaliation for filing this lawsuit. Doc. No. 70 at 1; Doc. No. 75 at 1.

Towles also alleges that Dr. Siddiq refused to provide him treatment for knee and shoulder pain on July 22, 2015 due to his filing this case. Doc. No. 102 at 1. Dr. Siddiq denies these allegations and maintains that he consistently provided treatment to Towles which he deemed necessary and appropriate. Specifically, Dr. Siddiq avers that he routinely examined Towles, evaluated his complaints and rendered treatment to Towles, including the provision of prescription medications, in accordance with his professional judgment. Defendants' Ex. 2 to the Defendants' Supplemental Special Report – Doc. No. 58-2 at 5; Defendants' Ex. 1 to the Fourth Supplemental Special Report – Doc. No. 115-1 at 15-16; Defendants' Ex. 1 to the Fifth Supplemental Special Report – Doc. No. 125-1 at 3-4. Dr. Siddiq denies any act of retaliation and asserts he "did not discontinue any orders of any kind and I did not withdraw my prior orders." *Id*. at 3. Dr. Siddiq further explains that his prescription of narcotic-like pain medications was tempered by Towles' "insistence upon remaining on pain medication … [and] his concern[] that the pain medication will become less effective over time if [Towles] continues to rely upon it too heavily." Defendants' Ex. 2 to the Defendants' Supplemental Special Report – Doc. No. 58-2 at 4.

Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)]. As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' *Id*., at 404-405, 94 S.Ct., at 1807.

Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley*, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259 (1987). "The first amendment prohibits state officials from retaliating against prisoners for exercising their right of free speech. *See, e.g., Wright v. Newsome*, [795 F.2d 964, 968 (11th Cir. 1986)]… . The gist of a retaliation claim is that a prisoner is penalized for exercising a right of free speech." *Thomas v. Evans*, 880 F.2d 1235, 1241-1242 (11th Cir. 1989); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003). The situation is clearly complicated when the alleged act of retaliation regards the provision of medical treatment as an inmate may attempt to inappropriately influence decisions regarding such treatment "by drawing the shield of retaliation around them." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied* sub nom *Palermo v. Woods*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996).

It is essential that federal courts "carefully scrutinize retaliation claims" brought by prisoners challenging the constitutionality of actions of correctional personnel. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied* sub nom *Palermo v. Woods*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996). "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983). This is [necessary because prisoners'] … claims of retaliation are … easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not

rising to the level of a constitutional violation—can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2nd Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To proceed on a claim of retaliation and withstand the entry of summary judgment, an "inmate must establish … three elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendants'] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999). With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred. *Woods*, 60 F.3d at 1166; *Smith*, 532 F.3d at 1278.

An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by showing "that his conduct was constitutionally protected and that this conduct … was a 'motivating factor'" behind the challenged action of the defendants. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977). Merely alleging the ultimate fact of retaliation, however, is insufficient.

*Cain v. Lane*, 857 F.2d 1139, 1142, n.6 (7th Cir. 1988); *Woods*, 60 F.3d at 1166. Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to establishing retaliation. *Morales*, 278 F.3d at 131; *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (Because prisoner retaliation claims are prone to abuse, "we are careful to require non-conclusory allegations."). If an inmate meets his burden with appropriate evidence, the burden of production shifts to the defendant to show that he "would have reached the same decision as to [plaintiff's discipline] even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. "Under the *Mt. Healthy* approach, if the government official 'can prove that [he] would have taken the adverse action in the absence of the plaintiff's protected conduct, [he] cannot be held liable.' *Thaddeus-X*, 175 F.3d at 388 n.4." *Smith*, 532 F.3d at 1278 n.22.

Towles alleges that Dr. Siddiq deprived him of medical care for filing this lawsuit, thus satisfying the first element of his retaliation claim — i.e., his exercise of a protected right. *Smith*, 532 F.3d at 1277. The second element requires Towles to demonstrate that he, in fact, suffered an adverse action — the denial of medical treatment — and that this denial "would likely deter a [prisoner] of ordinary firmness" from filing legal actions challenging the constitutionality of the medical treatment received. *Id*. This "presents an objective standard and a factual inquiry." *Id*. There is nothing before this court which indicates that Dr. Siddiq denied Towles medical treatment on the dates at issue. Instead, the medical records refute this allegation. Moreover, it does not appear to the undersigned that the challenged action would deter an ordinary inmate from filing lawsuits; indeed,

inmates routinely file complaints addressing the validity of medical treatment provided to them. Further, the records of this court establish that Towles was not in any way deterred in this pursuit. Finally, even if this standard were met, Towles fails to satisfy the third requirement for a retaliation claim, a causal connection between his constitutionally protected activity and the allegedly adverse actions of Dr. Siddiq.

The causal connection inquiry focuses on the "subjective motivation of the defendant[,]" *Thaddeus-X*, 175 F.3d at 399, and this court will therefore address "whether the defendant[] [was] subjectively motivated to" deny Towles medical treatment for filing this lawsuit. *Smith*, 532 F.3d at 1278. The subjective motivation issue is resolved by most courts under the burden-shifting test set forth in *Mt. Healthy*. This test requires that the plaintiff first meet "his burden of establishing that his protected conduct was a motivating factor behind any harm" — an element that the court assumes, *arguendo,* has been establshed — and then "the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399 (referencing *Mt. Healthy's* motive analysis).

Dr. Siddiq denies the allegations of retaliation made by Towles and maintains that he provided medical treatment to Towles which he, in his professional opinion, deemed medically necessary. Dr. Siddiq maintains that all treatment decisions were based solely on his medical judgment after evaluating Towles' complaints and assessing his condition. The medical records support Dr. Siddiq's assertions. Towles offers only his conclusory

allegation of ultimate fact that Dr. Siddiq retaliated against him for filing this case. This allegation is insufficient to defeat summary judgment. *Waddell*, 276 F.3d at 1279; *Holifield*, 115 F.3d at 1564, n.6. The record before the court is devoid of evidence from which a reasonable fact finder could infer the requisite motivating factor as to the alleged acts of retaliation. Additionally, the totality of the circumstances do not support drawing such an inference. Thus, Towles' retaliation claim falters on this element, as Dr. Siddiq has established that his treatment decisions were not affected by the filing of this lawsuit. In light of the foregoing, Dr. Siddiq is entitled to summary judgment on the retaliation claim presented by Towles.

## C. Perjury

Insofar as Towles claims that the defendants committed perjury in affidavits submitted in this case, Towles is entitled to no relief. Under 18 U.S.C. § 1621, perjury is a criminal offense and persons convicted of perjury are subject to fines, imprisonment, or both. "However, there is no federal civil remedy for perjury. *See Smith v. Fenner*, 1999 WL 592663, *2 (Aug. 6, 1999 N.D. Tex.) (dismissing claim for no subject matter jurisdiction because federal civil claim for perjury does not exist); *see also Roemer v. Crow*, 993 F.Supp. 834, 836-37 (D.Kan.1998) (dismissing claims as frivolous because 18 U.S.C. § 1621 'is a criminal statute which does not provide a civil right of action for damages') [*aff'd*, 162 F.3d 1174 (10th Cir. 1998)]." *Burnett v. Nagl Mfg.*, 2008 WL 234765, *2 (Jan. 25, 2008 D. Neb.); *see Briscoe v. LaHue*, 460 U.S. 325, 334-336 (1983) (all witnesses, including government officials, are entitled to absolute immunity from

damages liability for their testimony in judicial proceedings).Consequently, the defendants are entitled to summary judgment on this claim.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The defendants' motion for summary judgment be GRANTED.

2. Judgment be GRANTED in favor of the defendants.

3. This case be DISMISSED with prejudice.

4. The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before **August 25, 2017** the parties may file objections to this Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE, on this the 11th day of August, 2017.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge